**HADERLEIN AND KOUYOUMDJIAN LLP**
Jonathan Haderlein (Cal. Bar No. 336644)
jhaderlein@handklaw.com
Krikor Kouyoumdjian (Cal. Bar No. 336148)
kkouyoumdjian@handklaw.com
19849 Nordhoff St.
Northridge, California 91324
Telephone:  (818) 304-34345

**RUSSELL LAW, PC**
L. David Russell (Cal. Bar No. 260043)
david@russelllawpc.com
1500 Rosecrans Ave, Suite 500
Manhattan Beach, California 90266
Telephone: (323) 638-7551

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAYANNA BERRIN, an individual on her own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DELTA AIR LINES INC., a Delaware Corporation,<br><br>Defendant. | Case No.: 2:23-cv-04150-MEMF-MRW<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiff Mayanna Berrin ("Plaintiff"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief—except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge—against Defendant Delta Air Lines, Inc. ("Defendant" or "Delta").

## **NATURE OF THE ACTION**

1. This is a class action lawsuit, brought on behalf of a putative nationwide class, or alternatively a putative class of California residents, who have purchased Defendant's flights, against Defendant for grossly misrepresenting the total environmental impact of its business operations in its advertisements, corporate announcements, and promotional materials and thereby attaining underserved market share from environmentally concerned consumers. .

2. Defendant is one of the major commercial airlines in America and operates flights worldwide.

3. Since March 2020, Defendant has repeatedly touted itself as "the world's first carbon-neutral airline" across various channels including advertisements, press releases, LinkedIn posts, podcasts, and in-flight napkins.

4. Reasonable consumers reviewing these representations would believe that when taking account of all of Defendant's carbon emissions and related green investments, Defendant has not been responsible for releasing any net additional carbon into the atmosphere since March 2020.

5. Defendant has represented that its airline is "carbon-neutral" because of carbon offsetting via participation in the voluntary carbon offset market. The voluntary carbon offset market is a loose arrangement of companies and NGOs that facilitate investment in green projects such as renewable energy and prevention of deforestation. In exchange for their investment in these projects, companies receive "carbon offsets" in the form of credits that purport to

verify the amount of carbon that was not released due to the company's investments in the offset market. Defendant's claim of carbon neutrality therefore hinges on an underlying set of representations—that since March 2020 Defendant's investments in the voluntary carbon offset market have entirely offset the CO2 emissions from Defendant's global airline operations, such that Defendant has not been responsible for releasing additional carbon into the atmosphere during that time.

6.      Plaintiff has since discovered that any such representations are manifestly and provably false. As explained below, foundational issues with the voluntary carbon offset market mean the purchase of said offsets cannot make a company "carbon neutral." Even the primary offset vendors offer offsets replete with the following:

a.  inaccurate accounting;

b.  non-additional effects on worldwide carbon levels due to the vendors crediting offsets for projects that would have occurred with or without offset market investment;

c.  non-immediate speculative emissions reductions that will at best occur over decades, despite crediting purchasers with the sum of those projected offsets; and

d.  impermanent projects subject to disease, natural disasters, and human intervention

7.      These issues are specific to offsets purchased by and relied upon by Defendant. both scientists and government regulators have specifically identified Defendant as one of many companies who have grossly misstated the actual carbon reduction produced by their carbon offset portfolio. At the same time, Defendant's operation of a commercial airline causes significant carbon dioxide ("CO2") to be released into the atmosphere.

8.      Accordingly, Defendant's claims of "carbon neutrality" are false

FIRST AMENDED CLASS ACTION COMPLAINT

and misleading; the operation of Defendant's airline is not carbon neutral, and consumers would not have purchased tickets on Defendant's flights, or paid substantially less for them, had they known the claim of carbon neutrality was false.

9.    Plaintiff and the putative class were wronged by these actions. There is a significant demand for green services, and specifically services that do not contribute to climate change.  Since March 2020, Plaintiff purchased Delta flights due to her belief that by flying Delta she engaged in more ecologically conscious air travel and participated in a global transition away from carbon emissions.  During this entire period, Defendant still produced massive amounts of CO2, and its reliance on the voluntary carbon offset market in no way prevents its "carbon-neutral" representations from being false and misleading. Plaintiff would not have purchased Defendant's services, if she understood at the time of purchase that Defendant's carbon neutral representations were false.

10.    Plaintiff is a purchaser of Defendant's flights who asserts claims on behalf of herself and similarly situated purchasers of Defendant's flights for (i) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civil Code §§ 1750, et seq., (ii) violation of California's False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"), and (iii) Unlawful, unfair, and fraudulent trade practices in violation of California's Business and Professions Code § 17200.

## PARTIES

11.    Plaintiff Mayanna Berrin is, and at all times alleged in this Class Action Complaint was, an individual and a resident and therefore citizen of Glendale, California. Plaintiff Mayanna Berrin makes her permanent home in Glendale and intends to remain in Glendale.

12.    Defendant Delta Air Lines, Inc. is a corporation incorporated under the laws of the state of Delaware, with its principal place of business in Atlanta,

Georgia. Defendant markets, sells, and operates flights worldwide and throughout the United States, including the state of California. Defendant operated, marketed, and sold flights during the class period.

13.     Plaintiff has purchased flights on the Defendant's airline multiple times since March 2020, flying round-trip on Delta on May 6, 2021, November 19, 2021, October 10, 2022, and November 29, 2022.

14.     Prior to her purchase of the flights, Plaintiff had viewed advertisements, LinkedIn posts, and business reporting in which Defendant was touted as a carbon neutral airline.  Plaintiff relied on Defendant's representations that Defendant was a carbon neutral business.  Plaintiff saw these representations prior to, and at the time of purchase, and understood them as representations and warranties that the flight she had purchased was with a carbon neutral business.

15.     Plaintiff understood "carbon neutral" to mean that since March 2020 Defendant has removed or offset all the carbon it has emitted on a global basis. Plaintiff relied on these representations and warranties in deciding to purchase her flights with Defendant, rather than some other airline.  Accordingly, those representations and warranties were part of the basis of the bargain, in that she would not have purchased said flights on the same terms had she known those representations were not true.

16.     In making her purchase, Plaintiff relied on the false and misleading carbon neutral claim.  Plaintiff did not receive the benefit of the bargain because the flight she purchased was not, in fact, the product of a carbon neutral business.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2)(A) because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) Plaintiff and Defendant are citizens of different states.

FIRST AMENDED CLASS ACTION COMPLAINT

18. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

19. The injuries, damages and/or harm upon which this action is based occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of California, including within this District.

21. In accordance with California Civil Code Section 1780(d), Plaintiff concurrently files herewith a declaration establishing that, at various times throughout the class period, she purchased one or more flights with Delta Air Lines, Inc. while located in California.

22. Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### A. Environmental Impact is a Compelling Consideration for Consumers

23. The changing climate is widely appreciated as the crisis of our times. "Human activities, principally through emissions of greenhouse gasses (GHG), have unequivocally caused global warming, with global surface temperature reaching 1.1°C above 1850-1900 in 2011-2020."[1] "Observed warming is human-caused, with warming from greenhouse gasses, dominated by

---

[1] HOESUNG LEE ET AL., SYNTHESIS REPORT OF THE IPCC SIXTH ASSESSMENT REPORT 6 (STEVEN K ROSE ET AL. EDS., 2022).

CO2 and methane (CH4)."[2]

24.     Given the current severity of climate change issues, interest in environmentally friendly ("green") consumption is at an all-time high.  For many consumers, the environmental impact of a company's supply chain and operations has a significant impact on their purchasing decisions. As the Supreme Court of California has observed, "[t]o some consumers, processes and places of origin matter.  Whether a particular food is kosher or halal may be of enormous consequence to an observant Jew or Muslim.  Whether a wine is from a particular locale may matter to the oenophile who values subtle regional differences.  Whether a diamond is conflict free may matter to the fiancée who wishes not to think of supporting bloodshed and human rights violations each time she looks at the ring on her finger. And whether food was harvested or a product manufactured by union workers may matter to still others." *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 328–29, 246 P.3d 877, 889–90 (2011).

25.     The same is true of a company's environmental footprint.  "87% of consumers will have a more positive image of a company that supports social or environmental issues.  88% will be more loyal to a company that supports social or environmental issues.  87% would buy a product with a social and environmental benefit if given the opportunity."[3]  At the same time, "[i]n spite of consumers' willingness to contribute to a greener and more circular economy in their everyday lives, their active and effective role in this green transition is hampered by" "a lack of trust in the credibility of environmental claims and the proliferation of misleading commercial practices related to the environmental

---

[2] *Id.*

[3] Adam Butler, *Do Customers Really Care About Your Environmental Impact?*, FORBES (Nov. 21, 2018, 8:00 AM), https://www.forbes.com/sites/forbesnycouncil/2018/11/21/do-customers-really-care-about-your-environmental-impact/?

FIRST AMENDED CLASS ACTION COMPLAINT

sustainability of products."[4]

26.     In the interest of maintaining consumer loyalty and maintaining market position, companies have rolled out various environmental initiatives to encourage consumers to continue to purchase their goods and services.  These initiatives have led to accusations of "greenwashing"—referring to when environmentally harmful goods and services are rebranded as more ecologically conscious than they actually are in fact.  Greenwashing is difficult for consumers to identify, as by definition, the inherent information asymmetry between corporations and individual consumers means that "[c]onsumers cannot verify green attributes directly and must rely on such signals as eco-labels to authenticate claims."[5]

27.     These efforts are effective at changing consumer perceptions.  In one study, "[o]ver half (57%) of consumers (in the control condition) believed that greenwashed claims were a reliable source of information about a company's eco-practices. Consumers were also much more likely to agree that greenwashing energy companies had strong green credentials, compared to energy companies depicted in a non-greenwashed advertisement."[6]

## B.     A Brief Primer on the Voluntary Carbon Offset Market

28.     "Carbon offsets have become a popular tool in global efforts to mitigate climate change.  These programs work by offering regulated polluters the opportunity to increase their own emissions if they subsidize equivalent

---

[4] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) 2 (2023).
[5] Lucy Atkinson & Sonny Rosenthal, *Signaling the Green Sell: The Influence of Eco-Label Source, Argument Specificity, and Product Involvement on Consumer Trust*, JOURNAL OF ADVERTISING, Feb. 2014, at 33, 33-45.
[6] *Protecting consumers from Greenwashing*, THE BEHAVIOURAL INSIGHTS TEAM BLOG, (Jun. 23, 2022), https://www.bi.team/blogs/there-is-a-growing-epidemic-of-climate-anxiety/

FIRST AMENDED CLASS ACTION COMPLAINT

emission reductions in unregulated markets."[7]

29.    "The most common offsets are based on avoiding the release of additional carbon dioxide into the atmosphere, for example by preventing deforestation or supporting renewable energy projects.  The other, much more expensive, option is to fund programs that actually remove CO2 by planting forests or employing machines that capture greenhouse gas from the air and store them away."[8]

30.    "Offset logic goes like this: If it is cheaper for a company to buy an offset that cuts emissions somewhere else instead of in their own operations, then offsets are cost effective."[9]  "With each investment, the corporations rack up "credits" for the forests they save or restore, tokens representing a set amount of carbon dioxide ostensibly kept out of the atmosphere by storing it safely in the trees."[10]

31.    "On its face, the exchange seems like a win-win: Huge sums of money are funneled into environmental projects, mostly in poor countries with less ability to pursue large-scale forest protection on their own," while companies "can say they're zeroing out their carbon footprints by offsetting whatever emissions they can't eliminate from their own operations with $CO_2$ reductions elsewhere on the planet."[11]

[7] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 1 (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).
[8] Jess Shankleman & Akshat Rathi, *Net Zero Is Hard Work, So Companies Are Going 'Carbon Neutral'*, BLOOMBERG (Jul. 19, 2021, 3:50 AM), https://www.bloomberg.com/news/articles/2021-07-19/offsets-can-play-a-role-to-make-companies-carbon-responsible#xj4y7vzkg
[9] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions
[10] Josh Lederman, *Corporations are Turning to Forest Credits in the Race to go 'Carbon Neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Jan. 18, 2023, 12:58 PM), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259
[11] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

32.     "The last decade has seen billions of carbon offsets issued to project developers around the world, providing opportunities for regulatory compliance at lower cost."[12]  Interest in projects that prevent deforestation has risen "[i]n recent years, [as] a long list of Fortune 500 companies has begun purchasing credits from forest projects."[13]  "The market for [prevented deforestation carbon offset credits] credits is estimated in the hundreds of millions of dollars, a number growing year upon year as a cottage industry to sell, trade and authenticate forest credits has taken shape."[14]

33.     Offset programs all promote themselves as nominally certified. Certification and verification is essential—"when offset programs support projects that would have been developed anyway, they not only waste the limited resources available to mitigate climate change but also contribute to climate change by increasing global emissions."[15]  Unfortunately, the voluntary carbon offset market is self-regulated, leading to "multiple, competing 'certification' standards and a dizzying array of organizations or companies that act as middlemen, authenticating supposed greenhouse gas reductions and connecting credit buyers and sellers."[16]  Lack of standardization is not the only barrier to verification, as the market is also plagued by structural inabilities to track genuine progress and poor mathematical modeling.  For instance, in the context of prevented deforestation, "[m]easuring activity on the ground in far-flung

---

[12] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 30 (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).

[13] Josh Lederman, *Corporations are Turning to Forest Credits in the Race to go 'Carbon Neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Jan. 18, 2023, 12:58 PM), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259

[14] *Id.*

[15] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 30 (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).

[16] Josh Lederman, *Corporations are Turning to Forest Credits in the Race to go 'Carbon Neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Jan. 18, 2023, 12:58 PM), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259

rainforests can be incredibly difficult."[17]  And in an analysis of the "world's largest carbon offset program," which primarily arranges for the purchase of renewable energy offsets, researchers estimated "that at least 52% of approved carbon offsets were allocated to projects that would very likely have been built anyway"—"a substantial misallocation of resources."[18]

34.    There are also inherent conflicts of interest in the standard offset verification process.  According to ecologist Dan Nepstad, the president of the Earth Innovation Institute, "the carbon project developer" "hires the auditors.  So the auditors are working for the company that would benefit, really, from a good result."[19]  That means "it's up to companies to do their own due diligence to know that the credits they're buying are legitimate."[20]

### C.    Companies Purchase Carbon Offsets to Claim Carbon Neutrality, and Said Representations are Effective on Consumers

35.    Certain companies have also announced they are "carbon neutral" or working towards becoming "net-zero."  Climate-related claims that goods, services, or entities are "carbon neutral" or "100% CO2 compensated" are often predicated on the company having "offset" its carbon emissions by purchasing "carbon credits" "generated outside the company's value chain, for example from forestry or renewable energy projects."[21]  The basic premise of carbon offsets is that a company will invest money into a project with ostensibly positive environmental impact and in return they will receive "carbon offset credits" that

---

[17] *Id.*

[18] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 30  (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).

[19] Josh Lederman, *Corporations are Turning to Forest Credits in the Race to go 'Carbon Neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Jan. 18, 2023, 12:58 PM), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259

[20] *Id.*

[21] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) 31 (2023).

FIRST AMENDED CLASS ACTION COMPLAINT

estimate the project's carbon-reducing impact.  Though the "methodologies underpinning offsets vary widely and are not always transparent, accurate, or consistent,"[22] in theory, a company will only claim to be carbon neutral when they have accrued enough carbon credits in a year to fully "offset" the carbon emissions produced by their annual business operations.  In the words of Delta's Managing Director of Sustainability, Amelia DeLuca, being carbon neutral means that "for everything we emit, we take an action, though in our space mostly avoiding deforestation, to neutralize those emissions."[23]

36.     Carbon neutral representations are effective on consumers, especially for goods and services that consumers identify as otherwise environmentally harmful.  A 2015 study found that "the presence of a carbon-neutral label in an advertisement, regardless of the type of product, leads to more favorable perceptions of company environmental concern" while the presence of the carbon neutral label leads to "more pronounced increase[s]' in consumer perceptions of company environmental concern" when the product in question is "environmentally harmful" than when it is "environmentally neutral."[24]

37.     This is further corroborated by a March 2022 report documenting "a simulated market study" which "revealed that 87% of Americans value carbon-neutral labeled products over similar 'unlabeled' products" and "that this value is driven by better brand perceptions and feeling better when buying the product." This value was not merely reputational; "[p]eople placed a considerable monetary value on carbon-neutral products." In particular, an experiment found "that consumers consistently reported they were willing to pay more for [carbon-

---

[22] *Id.*
[23] Brands Unbridled, *Delta Air Lines: Taking Climate Commitments to New Heights*, STORYHORSE, (Nov. 1, 2021), https://storyhorsebranding.com/perspective/delta-airlines-taking-climate-commitments-to-new-heights/
[24] Amy Stokes & Anna M. Turri, *Consumer Perceptions of Carbon Labeling in Print Advertising: Hype or Effective Communication Strategy?*, JOURNAL OF MARKETING COMMUNICATIONS, 2015, at 300, 300-315.

neutral] labeled products compared to equivalent products in a shopping scenario.  The [carbon-neutral] label held substantial appeal across demographics, skewing slightly towards women. Carbon neutral products were similarly appealing across income, post-high school education levels, race, and age."[25]

38.    At the same time, consumers have reason to be concerned about aviation emissions.  "Over the past two decades, CO2 emissions from aviation have increased rapidly."  "Although the energy intensity of commercial passenger aviation has declined, due to improvements in the operational and technical efficiency measures adopted by airlines, this has been more than offset by the CO2 emissions resulting from the rapid growth in passenger numbers."[26]

### D.    Delta Claims Carbon Neutrality, Predicated on Carbon Offsets, in Order to Encourage Consumers to Fly Delta

39.    In February 2020, Delta CEO Ed Bastian announced that Delta was going "fully carbon neutral" as of March 1, 2020.[27] In order to achieve this goal, Bastian stated Delta was committing to using carbon removal and transitioning to sustainable fuels, committing "a billion dollars over this decade, or close to $100 million dollars a year."[28] On the question of carbon offsets, Bastian said "carbon offsets are "not the solution, there are not enough to go around…carbon offsets have a lot of efficacy issues, and quite honestly in some places they do more harm than they do good, or pay people to not do harm, that is not really helping

---

[25] Graham Gephart, *Understanding How Consumers Value Climate Neutral Certification*, CLIMATE NEUTRAL (Mar. 30, 2022), https://www.climateneutral.org/blog/understanding-how-consumers-value-climate-neutral-certification

[26] SEAN HEALY, SCOPING VOLUNTARY CORPORATE CLIMATE ACTION IN THE EUROPEAN AVIATION SECTOR 8 (ÖKO-INSTITUT ET AL. EDS., 2022).

[27] Jessica Bursztynsky, *Delta Airlines CEO Announces the Carrier will go 'Fully Carbon Neutral' Next Month*, CNBC (Feb. 14, 2020, 7:27 AM), https://www.cnbc.com/2020/02/14/delta-air-lines-ceo-carrier-will-go-fully-carbon-neutral-next-month.html

[28] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

our planet."[29]

40.    Since March 2020, Defendant has marketed itself across various platforms as "the world's first carbon neutral airline."

41.    A September 2021 video advertisement states that Delta is "committed to becoming the world's first carbon neutral airline on a global basis."[30]  As reported by Adweek, Delta's Managing Director of Sustainability, Amelia DeLuca, stated that Delta's intention for the advertisement was to communicate that "[w]hen you book with Delta, you can feel confident that we will offset the carbon emitted from your flight with us."[31]  The airline broadcast the campaign widely, "with placements airing on NBCUniversal properties and digitally in The New York Times, Lonely Planet and HuffPost Black Voices" along with audio and video content "appearing on Pandora, Spotify, Stitcher and YouTube," complemented with "targeted digital ads" "on social platforms including Facebook, Instagram, Reddit and Twitter."[32]  Molly Battin, Delta's Senior Vice President of Marketing, herself acknowledged that the purpose of the campaign was to raise awareness of Delta's carbon neutral status after "'proprietary research show[ed] that [Delta] customers [weren't] aware' of Delta's carbon neutral status," and that the media plan aimed to establish Delta "as an industry leader for sustainable change."[33]

42.    A September 28, 2021 LinkedIn Post by DeLuca (simultaneously posted to Delta's corporate website, and remaining there as of the date of filing) went on to state that Defendant "became the first carbon neutral airline on a global basis" in 2020, a commitment "from March 2020 onward, balancing our

---

[29] *Id.*

[30] Kathryn Lundstrom, *Delta's New Ad Campaign Takes Aim at Travel-Related Climate Guilt*, ADWEEK (Sep. 13, 2021), https://www.adweek.com/brand-marketing/delta-travel-related-climate-guilt-carbon-neutral/

[31] *Id.*

[32] *Id.*

[33] *Id.*

emissions with investments to remove carbon across our global operations."[34] DeLuca repeated these representations in a November 1, 2021 episode of the podcast Brands Unbridled, again advertising Delta as "the first carbon neutral airline in the world" such that "since March 1st, 2020 onward, until today and going forward, we are a carbon neutral airline."[35]  DeLuca went on, stating that "for everything we emit, we take an action, though in our space mostly avoiding deforestation, to neutralize those emissions."  And a November 4, 2021 LinkedIn post stated that "[i]n March 2020, Delta became the first carbon neutral airline globally."[36]

43.     During this time, Delta also printed and put into circulation an in-flight napkin, a photo of which is below, representing that Delta was "Carbon Neutral Since March 2020."



44.     Defendant also made specific representations as to the nature,

---

[34] Amelia DeLuca, *An Update on Our Path to Net Zero*, DELTA NEWS HUB (Sep. 28, 2021, 12:00 PM), https://news.delta.com/update-our-path-net-zero
[35] Brands Unbridaled, *Delta Air Lines: Taking Climate Commitments to New Heights*, STORYHORSE, (Nov. 1, 2021), https://storyhorsebranding.com/perspective/delta-airlines-taking-climate-commitments-to-new-heights/
[36] Delta Air Lines Inc., *An Update on Our Path to Net Zero*, DELTA NEWS HUB (Nov. 4, 2021, 12:45 PM), https://news.delta.com/delta-joins-first-movers-coalition-drive-breakthrough-technologies-and-sustainable-fuels

FIRST AMENDED CLASS ACTION COMPLAINT

impact, and structure of its carbon offset portfolio.  An April 22, 2021 "Earth Day" post on Delta's website claimed that as part of Delta's "commitment to carbon neutrality," Delta was intending to purchase "more than $30 million for portfolio [sic] of verified offsets to mitigate 13 million metric tons of Delta's 2020 emissions."[37]  Those investments ended up including "protecting half a million acres in an Indonesian peat swamp forest and a Cambodian wildlife sanctuary."[38]

45.     These representations were clearly made with the intent to encourage air travel on Delta.  Delta's September 2021 video advertisement that mentions its carbon neutrality is premised around encouraging consumers to see the world *and* save the world, and in September 2022, Delta's newly appointed Sustainability Officer reiterated that the purpose of Delta's carbon neutral representations was to convince consumers that they do not "have to choose between seeing the world and saving the world."[39]

///

///

///

---

[37] Delta Air Lines Inc., *Delta Spotlights Ambitious Carbon Neutrality Plan on Path to Zero-impact Aviation this Earth Month*, DELTA NEWS HUB (Apr. 22, 2021, 11:30 AM), https://news.delta.com/delta-spotlights-ambitious-carbon-neutrality-plan-path-zero-impact-aviation-earth-month

[38] Josh Lederman, *Corporations are Turning to Forest Credits in the Race to go 'Carbon Neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Jan. 18, 2023, 12:58 PM), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259

[39] Philba Wahba, *Delta's Sustainability Chief Says People Don't Have to Choose Between Flying and Protecting the Environment*, FORTUNE (Sep. 23, 2022, 5:47 AM), https://fortune.com/2022/09/23/delta-sustainability-chief-climate-change-esg-dont-choose-between-flying-protecting-environment/?_ptid=%7Bkpdx%7DAAAAvBfj3ejzgQoKY2ZRajJmTTN6ahIQbGhneDlqanZpbzR5cmh1ZxoMRVg1M0lEU01IUVNQIiUxODA4N2RnMGMwLTAwMDAzMjAydDhlYTJpNWZwcWMyNGNqaDBvKhhzaG93T2ZmZXJJUSVdTTlZWNk9RUEIxNDIwAToMT1RYVjlWNkRMVVI5Qg1PVFYySzVEMEpGTTRRUhJ2LYIA8BZ6M2U3bDRpcXNaCzQ3LjE1NS42My40YgNkd2NordrwogZwBHgM

---

16
FIRST AMENDED CLASS ACTION COMPLAINT

### E.     Defendant's Claims of Carbon Neutrality are False and Misleading

46.     Delta's representations of carbon neutrality are provably false and misleading.  Rather than achieving carbon neutrality through sustainable fuels and carbon removals, as initially promised, Delta has instead premised their carbon neutrality on the purchase of carbon offsets from the voluntary carbon market.  Nearly all offsets issued by the voluntary carbon offset market overpromise and underdeliver on their total carbon impact due to endemic methodological errors and fraudulent accounting on behalf of offset vendors, resulting "in offset credits of low environmental integrity and credibility that mislead consumers when they are relied upon in explicit environmental claims."[40]  "The methodologies underpinning offsets vary widely and are not always transparent, accurate, or consistent" leading to "significant risks of overestimations and double counting of avoided or reduced emissions."[41]  The primary issues with the carbon offset market are the offsets' lack of verifiability, additionality, immediacy, and durability.[42]

47.     Any one of these issues can mean that "a proposed offset won't actually reduce emissions much, if at all."  And it is only "when companies have achieved all the reductions they possibly can, and balanced the rest with carbon removals, would they achieve 'carbon-neutrality.'"[43]  This is because "if it would be preferable to simply avoid (not offset) the emissions in a scenario where the

---

[40] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) 31 (2023).
[41] *Id.*
[42] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions
[43] Jess Shankleman & Akshat Rathi, *Net Zero Is Hard Work, So Companies Are Going 'Carbon Neutral'*, BLOOMBERG (Jul. 19, 2021, 3:50 AM), https://www.bloomberg.com/news/articles/2021-07-19/offsets-can-play-a-role-to-make-companies-carbon-responsible#xj4y7vzkg

world followed an efficient and equitable approach to eliminating emissions, the act of offsetting cannot make up for this forgone opportunity.  Instead, the act of offsetting merely sets the world on a slightly less worse path, but one that still deviates from what is optimal."[44]  This is particularly true when "carbon credits are sold by companies to 'compensate' for an activity where optimal mitigation pathways require consumer behavioral change," such as "aviation, where identified pathways refer to the need for demand management, or limits on flying."[45]  And the risks of miscalculation are greater in the aviation sector, as "[a]viation emissions are especially impactful, since their total net effect is enhanced through a variety of non-CO2 radiative forcing processes that occur at high altitudes."[46]

48.     The offset industry is replete with well-documented problems, explained further below.  Regardless of those granular details, it is simply indisputable that issues with the offset market have been well-documented and publicized.   "In the EU, a 2021 study revealed that 85 percent of offsets failed to reduce emissions.  In response, EU member states decided offsets would not count toward European climate goals after 2021."[47]  "In 2019, a study similarly found that 82 per cent of California's offset credits do not provide climate benefits."[48] Yet despite all of these concerns, Delta has been specifically identified as a company that relies on dubious offsets that fall victim to all of these issues, rendering its claims of carbon neutrality false and misleading and particularly injurious in light of Delta's massive CO2 footprint as a major

---

[44] DERIK BROEKHOFF, EXPERT REPORT 5 (STOCKHOLM ENV'T INST. ET AL. EDS., 2022).
[45] *Id.* at 6.
[46] *Id.*
[47] Lois Parshley, *California's Carbon Offsetting May Actually be Increasing Emissions*, NEW SCIENTIST (Dec. 22, 2022), https://www.newscientist.com/article/2352926-californias-carbon-offsetting-may-actually-be-increasing-emissions/
[48] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

worldwide airline.[49]

        i.    Delta's Purportedly "Verified" Offsets Are Predicated on Misleading and Unverifiable Accounting of Carbon Impact

49.    The first reason it is false and misleading for Delta to represent it is carbon neutral on the basis of its offsets portfolio is that Delta's offsets are predicated on misleading and unverifiable accounting of the offset's carbon impact, due to the voluntary carbon market's "tendency to inflate" carbon impacts, resulting "in phantom carbon credits."[50]  Accurate accounting is essential for carbon neutrality claims to be true, as "[if a company's] calculations are not perfect, you're doing harm," due to the fact that the offsets need to meaningfully cancel out "[t]he consequences of adding carbon dioxide to the atmosphere," which "extend centuries, if not millennia, into the future."[51]

50.    Verification is important for all kinds of offsets.   Whether they are in the form of avoided deforestation, avoided emissions, or green technology investments, a company "must be able to verify that emissions actually fall.  If you're going to plant trees, you have to verify that they were actually planted and that they will survive for decades to come.  If you fund efficient, low-emission cook stoves for the rural poor in the developing world, you have to verify that they are actually delivered, kept in working condition, and used."[52]

51.    Yet, the voluntary carbon market is replete with dubious projections

---

[49] Akshat Rathi et al., *Junk Carbon Offsets Are What Make These Big Companies 'Carbon Neutral'*, BLOOMBERG (Nov. 21, 2022), https://www.bloomberg.com/graphics/2022-carbon-offsets-renewable-energy/#xj4y7vzkg

[50] Patrick Greenfield, *Carbon Offsets Used by Major Airlines Based on Flawed System, Warn Experts*, THE GUARDIAN (May 4, 2021), https://www.theguardian.com/environment/2021/may/04/carbon-offsets-used-by-major-airlines-based-on-flawed-system-warn-experts

[51] Lois Parshley, *California's Carbon Offsetting May Actually be Increasing Emissions*, NEW SCIENTIST (Dec. 22, 2022), https://www.newscientist.com/article/2352926-californias-carbon-offsetting-may-actually-be-increasing-emissions/

[52] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions

misleadingly packaged as guarantees. "Research into Verra, the world's leading carbon standard for the rapidly growing $2bn (£1.6bn) voluntary offsets market, has found that, based on analysis of a significant percentage of the projects, more than 90% of their rainforest offset credits – among the most commonly used by companies – are likely to be 'phantom credits' and do not represent genuine carbon reductions."[53]

52.     The three major voluntary carbon credit vendors from whom Defendant purchases offsets have repeatedly engaged in fraudulent projections that grossly overstate their guarantee of carbon reduction. One major problem is severe errors in how vendors project future offsetting. Researchers have found that in the context of avoided deforestation offsets, "in all projects that established crediting baselines using historical trends," "the crediting baselines significantly overstate deforestation in comparison to the counterfactual estimates based on synthetic controls."[54] In other words, offset vendors' routine erroneous reliance on historical data leads to the consistent overestimation of the total risks to existing forests, leading to significant overinflation of the estimated carbon reduction from the corresponding offsets. Investigations have further revealed that all three major voluntary carbon markets have engaged in fraudulently double and triple counting of projects, crediting several companies with the entire carbon offset from the same plot of land.[55][56]

53.     These issues are specific to Delta's offset portfolio. Delta's offset

[53] Patrick Greenfield, *Revealed: More Than 90% of Rainforest Carbon Offsets by Biggest Provider are Worthless, Analysis Shows*, THE GUARDIAN (Jan. 18, 2023), https://www.theguardian.com/environment/2023/jan/18/revealed-forest-carbon-offsets-biggest-provider-worthless-verra-aoe

[54] THALES A. P. WEST ET AL., OVERSTATED CARBON EMISSION REDUCTIONS FROM VOLUNTARY REDD+ PROJECTS IN THE BRAZILIAN AMAZON  3 (ERIC F. LAMBIN ed., NAT'L ACAD. OF SCI., 2020).

[55] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) (2023).

[56] DERIK BROEKHOFF, EXPERT REPORT (STOCKHOLM ENV'T INST. ET AL. EDS., 2022).

FIRST AMENDED CLASS ACTION COMPLAINT

portfolio is primarily composed of green technology investment offsets,[57] with an additional substantial investment in prevented deforestation.[58]  For instance, in 2021, Delta's offsets portfolio was 50% renewable energy offsets, 44% agricultural forestry and other land use offsets, and 6% renewable offsets.[59]  Yet these are precisely the kinds of offsets that are most likely to be the product of inaccurate baselining and double counting.

54.     These are precisely the kinds of offsets that are most likely to be the product of inaccurate baselining and double counting.  As noted above, a review of the world's largest carbon offset project, the green technology offsets project CDM, (whose green technology investment offsets are present in Delta's offset portfolio) revealed that there were serious issues with the project's baseline assumptions, undermining the likely value of more than half of the offsets sold by the project.[60]  The issue with CDM projects is that the offsets were routinely " awarded to projects that would have been developed without the subsidy" generated by the sales of the offsets, such that the offsets "did not represent emissions savings."[61]  In fact, CDM's offset allocation "compare[d] unfavorably with a lottery, indicating that there is substantial room for improvement in the design and implementation of the project selection mechanism."[62]  This is no mere inefficiency; "having a process that accurately screens out projects that do

---

[57] Akshat Rathi et al., *Junk Carbon Offsets Are What Make These Big Companies 'Carbon Neutral'*, BLOOMBERG (Nov. 21, 2022), https://www.bloomberg.com/graphics/2022-carbon-offsets-renewable-energy/#xj4y7vzkg

[58] Josh Lederman, *Corporations are Turning to Forest Credits in the Race to go 'Carbon Neutral.' Advocates Worry About 'Greenwashing.'*, NBC NEWS (Jan. 18, 2023, 12:58 PM), https://www.nbcnews.com/news/world/corporations-are-turning-forest-credits-race-go-carbon-neutral-advocat-rcna7259

[59] *US Airline Buys 12 Million mt of Carbon Offsets for $137 Million*, QUANTUM COMMODITY INTEL. (May 9, 2022), https://www.qcintel.com/carbon/article/us-airline-buys-12-million-mt-of-carbon-offsets-for-137-million-5848.html

[60] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 21 (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).

[61] *Id.*

[62] *Id.*

not require subsidies is essential to safeguarding the integrity of offset programs."[63]  Inaccurate projections lead to the misallocation of scarce climate change mitigation resources and the rubber stamping of net increase in global emissions.  Researchers found that rather than mitigate climate change, CDM's misallocation of carbon offset funds "may have increased global carbon dioxide emissions by 6.1 billion tonnes, equivalent to running 20 one-gigawatt coal power plants for their entire 50-year lifespan."[64]

55.     The same is true for deforestation projects.  Delta's 2021 agricultural, forestry and other land use offsets were all verified by the carbon offset vendor Verra.  Yet as noted above, recent reporting revealed that 90% of rainforest offsets provided by Verra during this period were predicated on poor baseline assumptions, and in fact had zero climate impact.[65]

ii.   Delta's Offsets are Non-Additional and Therefore Have Little to no Climate Impact

56.     The second reason it is false and misleading for Delta to represent itself as carbon neutral on the basis of its offset portfolio is that Defendant has almost exclusively relied on carbon offsets that are "non-additional."  A project is "non-additional" when it credits carbon offsets for reductions that would have occurred regardless of the involvement of the voluntary carbon market.  Carbon reductions "are additional if they would not have occurred in the absence of a market for offset credits.  If the reductions would have happened anyway – i.e., without any prospect for project owners to sell carbon offset credits – then they are not additional.

57.     Additionality is essential for the quality of carbon offset credits – if

---

[63] *Id.*

[64] *Id.*

[65] Patrick Greenfield, *Revealed: More Than 90% of Rainforest Carbon Offsets by Biggest Provider are Worthless, Analysis Shows*, THE GUARDIAN (Jan. 18, 2023), https://www.theguardian.com/environment/2023/jan/18/revealed-forest-carbon-offsets-biggest-provider-worthless-verra-aoe

FIRST AMENDED CLASS ACTION COMPLAINT

their associated GHG reductions are not additional, then purchasing offset credits in lieu of reducing your own emissions will make climate change worse."[66] Accordingly, any project that is non-additional is a carbon offset in name only, such that any claim of carbon neutrality that is even fractionally predicated on non-additional carbon projects is definitively false.  Yet, according to one study, "at least 52% of approved carbon offsets were allocated to projects that would very likely have been built anyway."  "In addition to wasting scarce resources," the sale of non-additional offsets "to regulated polluters" has likely "substantially increased global carbon dioxide emissions."[67]

58.     In practice, only "4% of offsets actually remove CO2 from the atmosphere."[68]  This is particularly concerning in light of the fact that even though carbon offsetting is not inherently mutually exclusive to initiatives that aim to directly reduce a company's emissions, e.g. reducing energy consumption or transitioning to low-or-no-carbon fuel sources, carbon offsetting often replaces direct emissions reductions because it is typically more cost effective for companies to engage in carbon offsetting than it would be for them to meaningfully decrease the carbon footprint and overall environmental impact of their products/services.  In practice, the low price of carbon offsets often deters companies from pursuing "emissions reductions in their own operations and value chains," despite adequate contributions to global climate change mitigation targets necessarily requiring the "effective reductions of emissions across"

---

[66] *What Makes a High-Quality Carbon Offset?: Additionality,* CARBON OFFSET GUIDE, https://www.offsetguide.org/high-quality-offsets/additionality/ (May 19, 2023, 2:17 PM).
[67] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 1  (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).
[68] Akshat Rathi & Ben Elgin, *What Are Carbon Offsets and How Many Really Work?*, BLOOMBERG (Jun. 14, 2022), https://www.bloomberg.com/news/articles/2022-06-14/what-are-carbon-offsets-and-how-many-really-work-quicktake

FIRST AMENDED CLASS ACTION COMPLAINT

"operations and value chains" instead of reliance on offsets.[69]  This makes non-additional offsets particularly pernicious for global climate goals; not only do they profoundly underperform other green efforts, but they provide companies a discounted means of claiming they are making a difference when they are in fact doing very little.

59.     Delta has been identified as having almost exclusively relied on non-additional offsets, with an offset portfolio consisting of "half renewables, mostly wind and solar projects in India."[70]  "Selling offsets for small sums as a way to support the economics of renewables doesn't provide any real benefit if it's already cheaper than building new coal or gas power plants."  "The issue is timing: many renewable offsets came into being just as solar and wind power established herself as the cheapest source of energy in most countries."[71]  "An expert review of Delta's largest single source of renewable offsets, the Los Cocos II wind farm in the Dominican Republic, determined that it almost certainly didn't need additional support."[72]  And, as revealed by an analysis of the very wind projects in India from which Delta has heavily purchased offsets, "at least 52% of approved carbon offsets were allocated to projects that would very likely have been built anyway."[73]

60.     Similar additionality concerns are present with avoided deforestation projects.  A 2021 study "found that California's offsets programs systematically over-credits the carbon-absorbing potential of its offset properties

_____

[69] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) 31 (2023).

[70] Akshat Rathi et al., *Junk Carbon Offsets Are What Make These Big Companies 'Carbon Neutral'*, BLOOMBERG (Nov. 21, 2022), https://www.bloomberg.com/graphics/2022-carbon-offsets-renewable-energy/#xj4y7vzkg

[71] *Id.*

[72] *Id.*

[73] RAPHAEL CALEL ET AL., DO CARBON OFFSETS OFFSET CARBON? 30 (GRANTHAM RSCH. INST. ON CLIMATE CHANGE AND THE ENV'T ET AL. EDS., 2021).

by nearly a third."  Further satellite analysis confirmed that "no additional carbon is actually being sequestered in these forests than would have been without the program."[74]

        iii.    Delta's Offsets do not Provide Immediate Offsetting, Misleadingly Claiming Carbon Offsets From Future Decades of Projected Offsets Against Current Emissions

61.    Third, Carbon offsets also need to be immediate.  In the same way there's a time value to money, there is a time value to carbon: "Your flight today dumps carbon dioxide into the atmosphere right now, worsening climate change from this day forth.  Saplings planted today won't grow large enough to offset today's emissions for decades, nor will investments in speculative technologies like nuclear fusion or direct air capture, even if they eventually become viable."[75] The same is true for green technology investments; projections of decades of fossil fuel replacement from a wind farm are a woefully imprecise means of calculating the actual impact of technologies that may well become obsolete in the intervening years.  Consumers also expect that carbon neutral claims are based on immediate carbon reductions.  The very premise of claiming carbon neutrality in a calendar year is that the year's omissions were offset that year.

62.    Nevertheless, Defendant's offsets are by definition not-immediate, despite Delta having repeatedly represented that the company is already "carbon neutral."

63.    Defendant claims its purchase of offsets meant that its corporate operations were "carbon-neutral" over a calendar year when the offsets in question are in fact only projected future carbon reductions.  In reality, the company invested in various green projects, calculated future years of carbon

---

[74] Lois Parshley, *California's Carbon Offsetting May Actually be Increasing Emissions*, NEW SCIENTIST (Dec. 22, 2022), https://www.newscientist.com/article/2352926-californias-carbon-offsetting-may-actually-be-increasing-emissions/

[75] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions

reductions or non-release from those projects, and then credited all of the years of future reductions from the single year's offset investments against a single contemporary year of emissions.  Therefore, Defendant's representations that it was "carbon-neutral" in a calendar year due to its purchase of offsets from the voluntary carbon market are in fact false—Defendant had simply invested in projects that, assuming nothing goes wrong, will altogether take all of those future years to offset Defendant's most recent year of carbon emissions.  "Regardless of quality, all [carbon offset] projects have long timelines and may take years to scale, which make determining their future effects (and dollar value) an act of educated guesswork."[76]  That means that "[n]o matter how rigorously vetted a program might be," offsets programs are "never literally negating the emissions," "even when companies that support [carbon offsetting] projects claim to make your purchase carbon neutral today."[77]

   iv. Delta's Offsets are Impermanent and Therefore Offer no Guarantee of Future Performance, Despite Delta's Carbon Neutral Claims Relying on Said Future Performance

  64. Fourth, offsets also need to permanently sequester carbon in order to meaningfully combat climate change.  "Carbon dioxide emissions stay in the atmosphere for a century or more, so you must offset an equivalent amount of emissions for at least that long.  Trees planted today are more likely to succumb to wildfire, disease, pests, or extreme weather as the world warms, and do not provide durable carbon storage."[78]  "To counterbalance fossil fuel emissions, therefore, carbon credits must be associated with mitigation that is similarly permanent. If mitigation is 'reversed' (i.e., carbon stored as a result of a

---

[76] Katie Okamoto, *Don't Be Fooled by 'Carbon Neutral' Shipping*, WIRECUTTER (Nov. 21, 2022), https://www.nytimes.com/wirecutter/blog/what-is-carbon-neutral-shipping/
[77] *Id.*
[78] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT SLOAN SCH. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions

FIRST AMENDED CLASS ACTION COMPLAINT

mitigation activity is subsequently emitted, so that no net reduction or removal occurs), then it no longer contributes to staying within a global carbon budget, and no longer serves a counterbalancing function. This is primarily a concern with mitigation activities that result in enhanced carbon storage in biospheric reservoirs (including trees, shrubs, soils, and other biological stores of carbon)."[79]

65.    There is an inherent problem with crediting companies with the environmental impacts of decades-long projections—"[i]t's impossible to prove a counterfactual."[80]  For instance, in the context of prevented deforestation, "[r]ather than just valuing what forests are actually there, which are actively providing a carbon sink or store right now, [carbon offset vendors] have to surmise which forests would still be here versus which ones are the bonus forests that were spared from the theoretical ax."[81]

66.    "Already, there are examples of forests associated with carbon crediting projects being destroyed by catastrophic fires, including projects funded by BP and Microsoft affected by the increasingly prevalent wildfires in the American West (Hodgson 2021). Such impacts are leading credit buyers to re-evaluate the risks of such projects. While some carbon offset programs, such as the Gold Standard, maintain insurance mechanisms to address carbon losses (essentially, 'buffer reserves' of credits that are issued but not circulated), there are questions about whether they are sufficiently robust and it is doubtful that such mechanisms can be effective over indefinite time periods."  For Gold Standard offsets, "the obligation to compensate for 'reversals' (i.e., carbon losses) may extend for as little as 20 years – far short of what is needed to fully

---

[79] DERIK BROEKHOFF, EXPERT REPORT 7-8 (STOCKHOLM ENV'T INST. ET AL. EDS., 2022).
[80] Patrick Greenfield, *Carbon Offsets Used by Major Airlines Based on Flawed System, Warn Experts*, THE GUARDIAN (May 4, 2021), https://www.theguardian.com/environment/2021/may/04/carbon-offsets-used-by-major-airlines-based-on-flawed-system-warn-experts
[81] *Id.2*

counterbalance carbon emissions." [82] Ultimately, "[t]he fragility of biospheric carbon reservoirs has led some scientists to object to any use of NCS to offset fossil carbon emissions."

67.    According to a report by the European Union, carbon offsets sold by the three major carbon offset vendors have in fact routinely credited companies with decades of projected increase in carbon offsetting from projects that subsequently severely underperformed or were, in some cases, destroyed altogether.  Offset vendors claim they insure against catastrophic future events by siloing offsets as insurance, but one study found that "one single disease, on a single tree species called tanoak, would be enough to completely wipe out the credits set aside for all disease-and insect-related mortality."[83]

68.    Accordingly, any claim that Defendant is a carbon neutral company is false and misleading, and Defendant either knew or should have known as such--Defendant's operations produce significant amounts of carbon into the atmosphere, and its purchase of fraudulently accounted and dubiously designed carbon offsets in no way make their operation produce no additional carbon year over year.  Despite the carbon offset market's claims of verification, its ultimate reliance on "ambitious and dynamic crediting baselines that depart from business as usual" has produced inaccurate and misleading accounting.  At the same time, the offsets herself "lack additionality", are non-immediate, and fundamentally fail to guarantee a permanent impact, all of which render the claim that those offsets make Delta "carbon neutral" provably false and misleading.[84]

---

[82] DERIK BROEKHOFF, EXPERT REPORT 9 (STOCKHOLM ENV'T INST. ET AL. EDS., 2022).
[83] Lois Parshley, *California's Carbon Offsetting May Actually be Increasing Emissions*, NEW SCIENTIST (Dec. 22, 2022), https://www.newscientist.com/article/2352926-californias-carbon-offsetting-may-actually-be-increasing-emissions/
[84] EUROPEAN COMM'N, DIRECTIVE OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL ON SUBSTANTIATION AND COMMUNICATION OF EXPLICIT ENVIRONMENTAL CLAIMS (GREEN CLAIMS DIRECTIVE) 31 (2023).

### F.   Delta Knew or Should Have Known These Statements Were False

69.   It is simply inaccurate to say that offset purchasers are unaware of problems with the voluntary carbon offset market.  Much the opposite is true— there are voluminous pages of industry-wide writing acknowledging the legal risks of continuing to engage in these misrepresentations.  "41% of corporate sustainability officers don't use carbon offsets because they don't trust them," and another "43% are seeking to have them rated or validated" to prevent misleading the public.[85]  At the same time, market leaders in transportation including Lyft and JetBlue have halted their offset programs and retracted carbon neutral claims out of concerns that the offset market is faulty and therefore carbon neutral claims are actionably false.[86]  And Credit Suisse, "an early purchaser of renewable offsets, now says it's among the companies shifting towards buying more rigorous removals."[87]  Even Walmart, the world's largest company by revenue, has made "a zero emissions commitment that does not rely on carbon offsets."[88]

70.   Delta's own current CEO Ed Bastian himself acknowledged the severe problems with offsets when Delta first announced its intention to go "fully carbon neutral" as of March 1, 2020.[89]  On the question of carbon offsets,

---

[85] AiDash Inc., Carbon Offsetting in 2023: A Chief Sustainability Officer's Guide to the Market 4 (2023).

[86] Justine Calma, *JetBlue No Longer Plans to Offset Emissions from Domestic Flights*, The Verge (Dec. 9, 2022), https://www.theverge.com/2022/12/9/23501665/jetblue-carbon-offsets-sustainable-aviation-fuel

[87] Akshat Rathi et al., *Junk Carbon Offsets Are What Make These Big Companies 'Carbon Neutral'*, Bloomberg (Nov. 21, 2022), https://www.bloomberg.com/graphics/2022-carbon-offsets-renewable-energy/#xj4y7vzkg

[88] Betsy Vereckey, *How to Choose Carbon Offsets that Actually Cut Emissions*, MIT Sloan Sch. (Nov. 2, 2022), https://mitsloan.mit.edu/ideas-made-to-matter/how-to-choose-carbon-offsets-actually-cut-emissions

[89] Jessica Bursztynsky, *Delta Airlines CEO Announces the Carrier will go 'Fully Carbon Neutral' Next Month*, CNBC (Feb. 14, 2020, 7:27 AM), https://www.cnbc.com/2020/02/14/delta-air-lines-ceo-carrier-will-go-fully-carbon-neutral-next-month.html

FIRST AMENDED CLASS ACTION COMPLAINT

Bastian said "carbon offsets are "not the solution, there are not enough to go around…carbon offsets have a lot of efficacy issues, and quite honestly in some places they do more harm than they do good, or pay people to not do harm, that is not really helping our planet."[90]

## CLASS ALLEGATIONS

71.    In addition to their individual claims, Plaintiff bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

72.    Plaintiff bring this class action lawsuit on behalf of a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, defined as follows:

73.    "The Class": All natural persons who, between March 6, 2020 and the present, purchased a Delta Airlines flight while located in California.

74.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

75.    Numerosity: Plaintiff does not know the exact size of the Class, but estimates that the Class is composed of more than 5,000 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

76.    Common Questions Predominate: This action involves common questions of law and fact to the Class because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that Delta Airlines was a carbon neutral airline.

77.    The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to

[90] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

the Class are:

> • whether Defendant operated a carbon neutral airline;

> • whether Defendant purchased carbon offsets that fully offset its annual year of emissions;

> • whether Defendant unfairly, unlawfully and/or deceptively misrepresented that it is a carbon neutral airline; that is has fully offset its emissions on an annual basis since March 2020;

> • whether the use of the term "carbon neutral" in Defendant's marketing violated Federal and/or California state law;

> • whether the advertising of Delta Airlines as being carbon neutral caused them to command a higher market share as compared with similar companies that do not make such a claim;

> • whether Defendant's advertising and marketing regarding carbon neutrality was likely to deceive the class members and/or was unfair;

> • whether a carbon neutrality claim is material to a reasonable consumer;

> • whether Defendant engaged in the alleged conduct knowingly, recklessly, or negligently;

78.    Typicality: Plaintiff' claims are typical of the claims of other members of the Class because, among other things, all such claims arise out of the same unlawful course of conduct in which Defendant engaged. Plaintiff and those similarly situated purchased Defendant's flights based on Defendant's misrepresentations and omissions that it is a carbon neutral airline that has fully offset all of its emissions since March 2020.  Thus, Plaintiff and the class members sustained the same injuries and damages arising out of Defendant's conduct in violation of the law. The injuries and damages of each class member were caused directly by Defendant's wrongful conduct in violation of law as alleged.

79.    Adequacy of Representation: Plaintiff will fairly and adequately

protect the interests of all class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiff has retained highly competent and experienced class action attorneys to represent their interests and those of the classes. By prevailing on her own claims, Plaintiff will establish Defendant's liability to all class members. Plaintiff and her counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

80.     Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

81.     Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its

maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT (THE "CLRA"), CALIFORNIA CIVIL CODE § 1750, *et seq.*)**
**(On Behalf of Plaintiff and the Class)**

82.     Plaintiff realleges and incorporate by reference all paragraphs alleged herein.

83.     Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

84.     Defendant's acts and practices, set forth in this Class Action Complaint, led customers to falsely believe that Defendant operated a carbon neutral airline since March 2020; and that Defendant purchased carbon offsets that meant it did not release any net additional carbon into the atmosphere on an annualized basis since March 2020.  By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendant has violated, and continues to violate, § 1770(a)(2), § 1770(a)(3), § 1770(a)(5)§,  and §1770(a)(9) of the CLRA. In violation of California Civil Code § 1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the services they sold. In violation of California Civil Code § 1770(a)(3), Defendant's acts and practices constitute improper representations regarding the affiliation, connection, or association with, or certification by, another.  In violation of California Civil Code § 1770(a)(5), Defendant's acts and practices constitute improper representations that the services they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code § 1770(a)(9), Defendant has advertised

goods or services with intent not to sell them as advertised.

85.     Plaintiff requests that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiff and the other members of the Class will continue to suffer harm.

86.     The violations herein alleged have not been corrected or rectified as required by Civil Code § 1782 within 30 days with respect to all Class Members. Plaintiff accordingly seeks on behalf of each Class Member actual damages of at least $1,000, punitive damages, an award of $5,000 for each Class Member who is a disabled person or senior citizen, and restitution of any ill-gotten gains due to Defendant's acts and practices.

87.     Plaintiff also requests that this Court award them costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## SECOND CAUSE OF ACTION
**FALSE ADVERTISING, BUSINESS AND PROFESSIONS CODE § 17500, *et seq.* ("FAL")**
**(On Behalf of Plaintiff and the Class)**

88.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

89.     Beginning on March 6, 2020, and repeatedly again within three (3) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of Delta flights.

90.     Defendant made representations and statements (by omission and commission) that led reasonable customers to believe (i) Delta Airlines operated a carbon neutral airline since March 2020; and (ii) that Defendant purchased carbon offsets such that it did not release any net additional carbon into the

atmosphere on an annualized basis since March 2020.

91.   Plaintiff and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth in paragraphs 39-45 above.  Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing Delta flights, or paying less for them.

92.   Defendant's acts and omissions are likely to deceive the general public. Defendant engaged in these false, misleading and deceptive advertising and marketing practices to control a greater market share. Accordingly, Defendant engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code. These practices, which Defendant used, and continues to use, to their significant financial gain, also constitute unlawful competition and provides an unlawful advantage over Defendant's competitors as well as injury to the general public.

93.   As a direct and proximate result of such actions, Plaintiff and the other class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

94.   Plaintiff seeks on behalf of herself and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

95.   Plaintiff seeks on behalf of herself and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendant from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising

and marketing practices complained of herein, plus interest thereon.  Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed.  Plaintiff and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent Class members.  *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'").  In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

96.     Plaintiff seeks on behalf of herself and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein.  Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future consumers to

repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which it is not entitled.  Plaintiff, those similarly situated, and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**THIRD CAUSE OF ACTION**
**UNLAWFUL, UNFAIR, AND FRAUDULENT TRADE PRACTICES IN VIOLATION OF BUSINESS AND PROFESSIONS CODE § 17200, *et seq*. (On Behalf of Plaintiff and the Class)**

97.     Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

98.     Since March 2020, and at all times mentioned herein, Defendant engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent business practices outlined in this complaint.

99.     In particular, Defendant has engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; and (ii) the FAL as described herein.

100.    In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) misrepresenting that Delta Airlines operated a carbon neutral airline since March 2020; and (ii) misrepresenting that Defendant purchased carbon offsets such that it did not release any net additional carbon into the atmosphere on an annualized basis since March 2020, and (iii) failing to inform Plaintiff, and those similarly situated, that the representations stated in (i) and (ii) above are false.

101.    Plaintiff and those similarly situated relied to their detriment on Defendant's unlawful, unfair, and fraudulent business practices. Had Plaintiff and those similarly situated been adequately informed and not deceived by

Defendant, they would have acted differently by, without limitation: (i) declining to purchase Delta flights, or (ii) purchasing flights from another airline.

102.   Defendant's acts and omissions are likely to deceive the general public.

103.   Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, et seq. of the California Business and Professions Code.

104.   These practices, which Defendant used for its significant gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

105.   As a direct and proximate result of such actions, Plaintiff and the other class members have suffered and continue to suffer injury in fact and have lost money and/or property in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

106.   As a direct and proximate result of such actions, Defendant enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

107.   Plaintiff seeks, on behalf of herself and those similarly situated, equitable relief as a result of Defendant's conduct.  Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed.

108.   Plaintiff and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide

reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient but requiring certification of UCL claim for entire class). In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

109. Plaintiff seeks on behalf of herself and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.Plaintiff seeks on behalf of herself and those similarly situated, aninjunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiff and those similarly situated have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and those similarly situated, respectfully request that the Court enter judgment against Defendant as follows:

A.  Certification of the proposed Class, including appointment of Plaintiff's counsel as class counsel;

B.  An award of compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including both pre-and post-judgment interest thereon;

C.  An order for full restitution;

D.  An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

E.  An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

F.  For reasonable attorneys' fees and the costs of suit incurred; and

G. For such further relief as this Court may deem just and proper.

///
///
///
///
///
///
///
///
///

1    **JURY TRIAL DEMANDED**

2        Plaintiff hereby demands a trial by jury.

3

4    Dated: July 19, 2023        Respectfully submitted,

5

6    _____

7    **HADERLEIN AND KOUYOUMDJIAN LLP**
    Jonathan Haderlein (Cal. Bar No. 336644)

8        jhaderlein@handklaw.com
    Krikor Kouyoumdjian (Cal. Bar No. 336148)

9        kkouyoumdjian@handklaw.com
    19849 Nordhoff St.

10       Northridge, California 91324

11       Telephone:  (818) 304-34345

12

13   **RUSSELL LAW, PC**
    L. David Russell (Cal. Bar No. 260043)

14       david@russelllawpc.com

15       1500 Rosecrans Ave, Suite 500
    Manhattan Beach, California 90266

16       Telephone: (323) 638-7551

17       *Attorneys for Plaintiff and the Proposed Class*

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Mayanna Berrin, declare as follows:

1.      I am a citizen of Los Angeles California and above the age of 18. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      At various times in the past four years I purchased flights while in the County of Los Angeles from Defendant Delta Air Lines Inc..

3.      I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Glendale, California, this 19th day of July, 2023.


*Mayanna Berrin*
Mayanna Berrin (Jul 19, 2023 11:00 PDT)

Mayanna Berrin