1               UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4 MAYANNA BERRIN,          ) Case No. LA CV 23-04150-MEMF
                        )                   (MRWx)
5         Plaintiff,    )
                        )
6 vs.                   ) Los Angeles, California
                        )
7 DELTA AIRLINES, INC.,     ) Thursday, December 14, 2023
                        )
8        Defendant.    ) (11:24 a.m. to 12:18 p.m.)
      _____)

9

10    TRANSCRIPT OF MOTION TO DISMISS CASE THE FIRST AMENDED
     COMPLAINT FILED BY DEFENDANT DELTA AIR LINES INC. [22]
11     BEFORE THE HONORABLE MAAME EWUSI-MENSAH FRIMPONG
             UNITED STATES DISTRICT JUDGE

12

13

Appearances:             See next page.
14

Court Reporter:          Recorded; CourtSmart
15

Courtroom Deputy:       Daniel Tamayo
16

Transcribed by:         Lorraine Caldwell
17                      Echo Reporting, Inc.
                         9711 Cactus Street, Suite B
18                    Lakeside, California 92040
                         (858) 453-7590
19

20

21

22

23

24

Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

2

1  APPEARANCES:

2  For the Plaintiff:            JONATHAN JAMES HADERLEIN, ESQ.
                                 KRIKOR KOUYOUMDJIAN, ESQ.
3                                Haderlein & Kouyoumdjian, LLP
                                 19849 Nordhoff Street
4                                Northridge, California 91324
                                 (818) 795-0420
5                                (818) 304-3435

6  For the Defendant:            DAVID L. BALSER, ESQ.
                                 King & Spalding, LLP
7                                1180 Peachtree Street
                                   Northeast
8                                Suite 1600
                                 Atlanta, Georgia 30309
9                                (404) 572-4600

10                               MICHAEL DIETZ ROTH, ESQ.
                                 King & Spalding, LLP
11                               633 West Fifth Street
                                 Suite 1600
12                               Los Angeles, California 90071
                                 (213) 443-4355

13

14

15

16

17

18

19

20

21

22

23

24

25

1   <u>Los Angeles, California; Thursday, December 14, 2023 11:24am</u>

2                        --o0o--

3                     (Call to Order)

4           THE COURT:  And we can call the next case.  Thank

5   you.

6           THE CLERK:  Calling Item 7, LACV23-4150, Mayanna

7   Berrin versus Delta Airlines, Inc.

8           Counsel, please come forward and stat your

9   appearances for the record.

10          MR. BALSER:  Good morning.  David Balser, King and

11  Spalding, on behalf of Delta Airlines.

12          MR. ROTH:  Good morning, your Honor.  Michael

13  Roth, King and Spalding, also on behalf of Delta Airlines.

14          MR. HADERLEIN:  Jonathan Haderlein on behalf of

15  Mayanna Berrin.

16          MR. KOUYOUMDJIAN:  Krikor Kouyoumdjian on behalf

17  of Mayanna Berrin, and we're both --

18          THE COURT:  I'm sorry.  I didn't hear your name,

19  whoever -- I can't tell who was the second person speaking.

20          MR. KOUYOUMDJIAN:  Krikor Kouyoumdjian, your

21  Honor.

22          THE COURT:  Thank you.

23          Okay.  Give me just one moment.  And I trust the

24  parties received the Court's tentative?

25          MR. HADERLEIN:  Yes, your Honor.

4

1        THE COURT:  Okay.  Since this is the defense

2   motion, I will let the defense be heard.

3        MR. BALSER:  Good morning, your Honor.

4        THE COURT:  And, again, if you could just identify

5   yourself for purposes of the record.

6        MR. BALSER:  Yes.  David Balser of King and

7   Spalding on behalf of Delta Airlines.

8        THE COURT:  Thank you.

9        MR. BALSER:  Thank you very much for submitting

10   the tentative order to us.  It was very helpful, and we

11   appreciate the opportunity to argue the substance of that

12   order today, and if it pleases the Court, I'd like to jump

13   right into the tentative order and start with the ADA

14   preemption analysis.

15        The Court's tentative order denies Delta's motion

16   on ADA preemption grounds based primarily on the Ninth

17   Circuit's holding in _Dilts_, and the conclusion that

18   regulating Delta's representations about carbon neutrality

19   would not bind Delta to any particular rate or service.

20        For reasons I'm going to explain in a minute, we

21   think that the tentative order misapplies _Dilts_ in the way

22   it impermissibly narrows ADA preemption, and we also believe

23   that the tentative order's ADA analysis doesn't take into

24   account fully the nature of the claims that Plaintiff

25   asserts here, and the required economic injury that the

*Echo Reporting, Inc.*

5

1 Plaintiff has to allege for those claims to be viable.

2          The starting points for the Court's ADA analysis

3 has to be the nature of the claims that are actually alleged

4 in the complaint, and, as the Court recognizes in the

5 tentative order, and we agree with, the Plaintiff's claims

6 for violation of the false advertising law and unfair

7 competition laws are insufficiently pled.

8          So that leaves only claims under the Consumer

9 Legal Remedies Act, and those claims necessarily hinge on

10 the allegation that Plaintiff suffered an economic injury in

11 connection with the purchase of her Delta flights.  It's

12 that transaction, the purchase of Delta flights, based on

13 Delta's representation of its services, that is the subject

14 of the state action here.  When understood in that context,

15 we believe that Plaintiff's claims fall squarely within the

16 ambit of the Supreme Court authority on ADA preemption.

17          So I want to start, if I can, with just very brief

18 background on the purposes of the ADA, because I think the

19 underlying purpose is a critical consideration in

20 understanding what we think and contend is the breadth of

21 ADA preemption.

22          According to the Supreme Court in _Morales_, which

23 another court has read, in enacting the ADA, Congress

24 determined that maximum reliance on competitive market

25 forces would best further efficiency, innovation, and low

6

1  prices, as well as variety and quality of air transportation

2  services, and that's of foundational importance in this

3  case.

4          As the Court recognizes in its tentative order,

5  the crux of Plaintiff's claims is how Delta can advertise

6  key aspects of its core air transportation services that

7  allow it to compete with other airlines for specific groups

8  of customers here, customers who are environmentally

9  conscious.

10          The whole point of the ADA is to allow the market

11 to regulate airlines, because that will assure efficiency,

12 innovation, and low prices, and that's exemplified by the

13 very conduct at issue here.  Delta offered its core service,

14 which is flying customers on its airplanes, as carbon

15 neutral, understanding the importance of that attribute of

16 its service to customers and the environment.

17          The Supreme Court also explained in Roe, which is

18 a case cited in the tentative, that without preemption,

19 airlines would be subject to a confusing patchwork of state

20 regulations, and that concern is present here where

21 different states could apply their consumer protection laws

22 in different ways to create conflicting mandates on what

23 Delta can and cannot say or do in marketing its services.

24          Finally, importantly, just as background, Congress

25 has made the judgment that airline marketing practices

7

should be policed by the DOT, and not by private suits under
consumer protection laws.  The DOT is specifically
authorized to take enforcement action against deceptive
airline advertisements through fines and/or injunctive
relief.  The DOT has promulgated consumer protection
regulations that mirror state consumer protection laws
against unfair and deceptive practices, and the DOT has
issued enforcement orders and levied civil penalties based
on those regulations.

The Court's tentative order describes Wolens in a
way that leaves open the possibility that attempts to
regulate airline advertising may not be preempted, but we
are aware of no opinion where a Court has reached that
conclusion, and certainly not any opinion that involved
claims that the customer paid too much for flights based on
an allegedly false advertisement about the nature or
attribute of the services.  So, to be clear, were the
tentative to be issued as the final order, it would be the
first and only state law false advertising case where the
Court did not find the claims preempted.

So, against that backdrop, we respectfully submit
that the Court's tentative order is far too restrictive in
its application of ADA preemption, and overlooks the direct
relationship to rates that Plaintiff's actual claims in the
case establish.

8

1          I know the Court has read _Morales_, and _Morales_ is

2    clear that the language related to is very broad.  Under the

3    formulation in that case, the Supreme Court concluded that

4    any law that has a connection with or reference to rates or

5    services is preempted.  In analyzing the claims here, in the

6    tentative, the Court characterizes this case as a borderline

7    case where the law does not directly refer to rates or

8    services.  We think that characterization overlooks the

9    direct relationship between Plaintiff's claims and Delta's

10   rates as alleged in the amended complaint.

11          In her original complaint, Plaintiff alleged that

12   she paid a price premium based on Delta's alleged false

13   advertising, but even after amending her complaint, in an

14   attempt to plead a claim that isn't preempted, acknowledging

15   that the price premium allegations walked her directly in to

16   ADA preemption, Plaintiff's amended complaint still includes

17   the following allegations.

18          First, in paragraph 14, she alleges that, prior to

19   buying Delta's flights, Plaintiff viewed advertisements

20   where Delta touted itself as a carbon-neutral airline.

21   Second, she alleges that Delta's advertisements were clearly

22   made with the intent to encourage air travel on Delta and

23   attract an under-served market of ecologically conscious

24   travelers by influencing purchasing decisions in maintaining

25   customer loyalty.  Those are paragraphs 45, 24, and 26.

9

1          She alleges, third, that Delta's representations
2   about carbon neutrality were part of the basis of the
3   bargain for Plaintiff in purchasing her flights -- that's
4   paragraphs 15 and 16 -- and she alleges that, had she have
5   been adequately informed, she would have declined to
6   purchase Delta flights or paid substantially less for them.
7   That is paragraphs 91 and 101 of the first amended
8   complaint.
9          So, even though Plaintiff doesn't use the term
10  "price premium" in the first amended complaint, she's
11  nevertheless alleging that the price she paid was too high
12  for the services that she got.  Despite these allegations,
13  the Court's tentative order states that -- and this is at
14  page seven -- that any claims about what Berrin would have
15  paid did not affect Delta's rates in the way that
16  allegations that Delta charged a price premium does.
17         So here's my take on that.  This is a purported
18  consumer class action seeking damages under the CLRA based
19  on alleged misrepresentations in connection with the
20  purchase of Delta flights.  The entire thrust of the claim
21  is that consumers paid too much for flights based on the
22  representation of carbon neutrality.  That is a price
23  premium case, even though the Plaintiff has excised the term
24  "price premium" from the first amended complaint.  It has to
25  be.  Otherwise, there is no injury to pursue a claim.

1        What Plaintiff has to prove to establish her

2   claims is that a reasonable consumer would likely be

3   deceived by Delta's statements into purchasing flights or

4   paying more for them, so the attempt made in the tentative

5   order to distinguish this case from a price premium case,

6   based on Plaintiff's subjective belief, doesn't work,

7   because the standard is the reasonable objective consumer.

8        So, to us, the elimination of the express

9   allegation of a price premium is just semantics.  The crux

10  of the Plaintiff's allegation is that she overpaid for the

11  flight.  Furthermore, the point is not whether the claims

12  impact how much Delta should charge or is required to

13  charge, as the Court's tentative frames it.  It's simply

14  whether Plaintiff's claims relate to rates.  Plaintiff's

15  allegation that consumers paid too much for flights and were

16  damaged thereby directly relates to the rates that Delta

17  charged them.

18        At bottom, Plaintiff's complaint is that she

19  bought flights that she would not have, paid more for those

20  flights, because of how Delta advertised its services, she

21  says falsely, and she seeks to recover, on behalf of herself

22  and others the money paid to Delta for those flights.  So,

23  in our view, Plaintiff's claims are directly connected to

24  Delta's rates, and preempted as a result, but, even if the

25  Court were to analyze the allegations here as an indirect

11

1  connection, as opposed to directly, we believe that the

2  standard that the tentative applied is too narrow.

3         Dilts makes clear that a law that has only an

4  indirect relation to rates or services may also be

5  preempted.  The Court recognizes that in the tentative

6  order.  The Court's tentative order relies on Dilts to

7  conclude that the appropriate analysis in the case where the

8  question is not direct is whether or not Delta would be

9  bound to particular rates throughout their services if its

10 representations about carbon neutrality were regulated by

11 state law.  That's at page six of the tentative order.

12        But under Dilts, that test is not applied unless

13 the Court first determines that the Plaintiff's claims are

14 not significantly related to rates, routes, or services,

15 even indirectly, and, given Plaintiff's claims that she paid

16 a rate that was too high for the services advertised, her

17 claims are significantly related to rates, even if it it's

18 indirectly.

19        So a few other points on Dilts, as to why we think

20 the Court should not rely on that case to determine the

21 issues that are presented here.  First, most importantly,

22 the issue there, as this Court knows, was wage-and-hour

23 laws.  That's a totally different breed of claim than we're

24 talking about here.  Here we have consumer protection claims

25 that fall squarely within the jurisdiction of the DOT.

12

1         In fact, other cases have distinguished _Dilts_ on

2  that basis, including the _People ex rel. Harris_ that we cite

3  in our papers.  I know that's a California Court of Appeal

4  case.  It's not binding on the Court.  But the reasoning in

5  that case is persuasive, and the facts are more on point, I

6  think, than the _Dilts_ case is.

7         In _Dilts_, the Court also explained that it was not

8  presented with a concern over creating a patchwork of

9  regulations because the workers worked exclusively in

10 California and so weren't covered by any other state laws or

11 federal regulations, and, finally, the statute at issue

12 there in _Dilts_, the FAAAA, expressly does not regulate a

13 state's authority to enact safety regulations with respect

14 to motor vehicles, which heavily influenced the Ninth

15 Circuit's analysis in that case.  So, in short, this is a

16 completely different case.

17        The _Dilts_ court also clarified that laws are more

18 likely to be preempted when they operate at the point where

19 carriers provide services to customers at specific prices,

20 and the consumer protection laws at issue here operate at

21 the point where Delta provides its services to customers,

22 and the Plaintiff's allegations make that clear.  She says

23 this was the basis of the bargain.  Indeed, it's inherent in

24 the consumer protection laws at issue here, which is exactly

25 why the Supreme Court in _Wolens_ held that these types of

13

1 claims are preempted.

2        In the tentative ruling, the Court characterizes

3 the Plaintiff's claims as being about Delta's carbon

4 neutrality, and that's -- I know the Court is familiar with

5 its order.  That's at page nine.  But, respectfully, this

6 case is not about regulation of carbon neutrality.

7        What the Plaintiff seeks to do here is police

8 Delta's advertising of its core service, and nothing

9 illustrates this better than the picture of the cocktail

10 napkin that's reproduced at paragraph 43 of the first

11 amended complaint.  That cocktail napkin says, and I quote,

12 "Travel confidently knowing that we will offset the carbon

13 emitted on your Delta flight."  This is an advertisement

14 about Delta's core service.  It is saying, "Your flight will

15 be carbon neutral."

16        The Court's tentative order distinguishes <u>Wolens</u>

17 in that it applies to marketing of air transportation

18 services.  That's what the Court said about <u>Wolens</u>, but

19 that's exactly what this case is about.  Plaintiff's

20 allegations, not just in paragraph 43, make that clear.  In

21 paragraph 45, she alleges, and I quote, "Delta's services

22 are rebranded as more ecologically conscious than they

23 actually are in fact," close quote, "and," quote, "were

24 clearly made with the intent to encourage air travel on

25 Delta."

14

1        As Plaintiff acknowledges, airlines compete for

2 environmentally conscious travelers such as herself by

3 advertising environmentally practices.  That cuts to the

4 heart of the ADA, preventing state regulation over matters

5 over which airlines compete.

6        Delta also acknowledges that Delta's

7 representations regarding carbon neutrality were part of the

8 basis of her bargain and induced her to fly with Delta

9 because of her desire to engage in more ecologically air

10 travel.  Alleging that Delta's advertisements about carbon

11 neutrality were part of Plaintiff's bargain for exchange

12 brings her claims directly within the ambit of the ADA.

13        The Court's tentative order, which would require

14 that a state law be used in a way to bind an airline to rate

15 or service, in our view, disregards the Supreme Court

16 precedent, other precedent applying ADA preemption, where

17 the indirect connection to rates and services was far more

18 remote than here, in our view.  Indeed, in our view, this

19 case isn't anywhere close to the fringe.  That is, it's

20 not -- to use the parlance of Delta, it's not a borderline

21 case when it comes to the application of the ADA preemption

22 standards.

23        For example, advertising a flight as carbon

24 neutral is in no way analogous to the hypothetical

25 advertisements by an airline for prostitution and gambling,

15

1 which were examples the Supreme Court used in _Morales_ of

2 airline advertising that might not be preempted and that the

3 Court references in its tentative ruling.  Prostitution and

4 gambling have absolutely nothing to do and are in no way

5 related to the services that Delta provides, and are illegal

6 under California law.  When Delta says, "The carbon from

7 your flight will be offset," that is related to our flights,

8 and it is not illegal.

9          So I think, really, the question is, where on the

10 spectrum does that allegation lie, I mean, the contention of

11 carbon neutrality?  You know, to us, it's not like

12 advertising that you can gamble or engage in prostitution on

13 Delta's flights.  It's more -- it would be like if we said,

14 "Our" -- "We've got the fastest plans.  We're got the newest

15 fleet."  And at what point -- where do you draw the line?

16          And I think the Court recognizes it is an exercise

17 in line drawing, but I think, if you look, this is not an

18 outlier case.  This is a case where we're saying our core

19 service, flying people on our airplanes, is going to result

20 in carbon neutrality.  It is an attribute of the flight that

21 we are touting, and we think that that puts this much more

22 squarely in the ambit of _Morales_ and _Wolens_ than it does in

23 the world of _Dilts_ or some outlier case where you've got to

24 come up with a different standard.

25          THE COURT:  Can I ask you a question about the

16

1  analogy to gambling or prostitution?  I'm not sure that the

2  fact that those activities are illegal is what would be the

3  distinguishing factor, because the question is, is what

4  Delta is doing illegal, calling itself carbon neutrality if

5  it's not?  That's the allegation.

6       And I guess I just would press on and ask you to

7  further elucidate, what is the difference between -- first

8  of all, let me start with this, that you agree that,

9  although you're describing the allegations as being about

10 advertising of the core service, in actual fact, the way

11 that the carbon neutrality works is that it's not anything

12 different that Delta is doing with flying its planes.  It's

13 something that it's doing elsewhere to offset what it's

14 doing with flying its planes, right?

15       MR. BALSER:  I do agree with that.

16       THE COURT:  So we're not -- and maybe there's a

17 case out there regarding -- if you claimed that you were

18 using biodiesel and you weren't using biodiesel, that, I

19 think, would be a slightly different case.  Okay.

20       So, given that somewhat attenuated -- in the

21 Court's view, the analogy -- so I just want to make sure

22 that you have a chance to respond to it -- is that if Delta

23 was to say, "Listen.  You should fly on our plans because we

24 will permit you to engage in gambling and prostitution and

25 other things that you might want to do that other airlines

17

1  are not going to allow you to do," why is that less -- how

2  would you distinguish that in terms of being part of the

3  core service?  Because the idea is just like "On our planes,

4  you can get a snack.  You can get wi-fi.  You can get

5  gambling.  You can get prostitution."  To the Court's view,

6  that seems like "Okay.  That's about the core service, so

7  this is even less so about that."

8          So that's where the Court's line drawing is.  So

9  I'll let you respond to that, because I don't think it's

10  about whether the activity is illegal or not.

11          MR. BALSER:  Okay.  So I appreciate that, your

12  Honor, and it's a great question.  I think that the fact is,

13  the -- when you look at what the purpose of this marketing

14  campaign is, it is to attract ecologically conscious

15  passengers to our flights.

16          Our -- every plane that flies has -- generates

17  carbon and carbon emissions.  That is a -- it is a byproduct

18  of flying the airplane, and we know that there -- to some of

19  our customer base, offsetting the byproduct of flying that

20  plan is valuable to them, and, therefore, it is, I think,

21  much more connect to our core service than something like

22  gambling or prostitution would be that has absolutely -- I

23  mean, our -- there is no -- there's not a -- there's no

24  connectivity of an activity like gambling or prostitution

25  that is the natural byproduct of engaging in our core

18

 1  service.  So, while there may be some members of the

 2  public --

 3          THE COURT:  But that's just the point, is that if

 4  you were to offer that as part of your service, the same way

 5  you offer food or other things -- I think we might be

 6  talking past each other, and perhaps we have to move on,

 7  but, at least as the Court sees it, the question is, it

 8  seems that courts have said, "Listen.  States can regulate

 9  gambling, they can regulate prostitution, even if an airline

10  was to offer it on their flights, as part of their

11  services," and if an airline was to offer it on a flight as

12  part of its services, that would be part of the core

13  service.

14          You're flying people, and these are the things

15  you're giving them, in the same way I think you would argue

16  that the other things are part of the core service, like I

17  said, the food, the wi-fi, et cetera.  So I'm not sure

18  that -- yes.

19          MR. BALSER:  So here's another response to

20  it that --

21          THE COURT:  Okay.  Thank you.

22          MR. BALSER:  -- that, hopefully, will be more

23  satisfactory to the Court, and what I think, really, the

24  Court in Morales was getting at -- there is an historic --

25  and I think Dilts, to some -- I think this does fit into

19

1 <u>Dilts</u>, too.  There is an historic police power function to

2 the state that is immune, if you will, from preemption.

3        I think the historic police powers of the state of

4 California that regulate prostitution and gambling would be

5 of the type that, even if an airline were to advertise that

6 as part of its service, could still be regulated by the

7 state.  There is no -- and I don't -- I just don't think

8 carbon neutrality fits into that paradigm in any way,

9 because there's no historic police power state regulation

10 regarding carbon neutrality.

11        THE COURT:  Understood.

12        MR. BALSER:  So I think that's a distinction that

13 matters there.

14        THE COURT:  Okay.

15        MR. BALSER:  So we -- so, when you look at the

16 panoply of cases -- and I do recognize that many of the --

17 some of the cases we cite, not all of them, but some of the

18 cases we cite are not federal court cases from either this

19 district or Ninth Circuit, but when you look at the <u>People</u>

20 <u>ex rel. Harris</u> case, which is the case about our -- Delta's

21 mobile application, where the state of California brought a

22 UCL claim against Delta, alleging that the mobile

23 application violated the California Online Privacy

24 Protection Act, the Court, California Court of Appeal, held

25 that the claims there were preempted, even though you were

20

1  talking about a mobile app, and a privacy notice on a mobile

2  app which, in my view, is less connected to route trades and

3  services than advertising that your flight is carbon

4  neutral.

5          We cited the <u>Vale</u> (phonetic) case from New Jersey.

6  I know the Court is familiar with that.  One case that's

7  interesting -- I don't know if the Court has had an

8  opportunity to study it -- was a case I think I argued in

9  this courtroom, which was the -- or it was a courtroom in

10  this courthouse -- which is the <u>Pica</u> (phonetic) case, which

11  Judge Fitzgerald decided.

12          This was a case -- it's a data breach case against

13  Delta that was filed.  Delta had a vendor that provided a

14  chat function on its website.  The vendor got breached, and

15  there was a dissemination of PII of Delta customers, and

16  claims were brought under the UCL.  We moved under the ADA

17  for -- on preemption grounds, and Judge Fitzgerald agreed

18  with us, and found it, comfortably, he said, that preemption

19  applied there, and while that case isn't, of course, binding

20  on the Court, I think it's persuasive.

21          In that case, the allegations about our website

22  and whether we provided adequate security on the website to

23  protect PI are further afield and more tenuous than

24  advertisements about our core service, I would argue.  So,

25  when you look at these cases, <u>Harris</u>, <u>Vale</u>, <u>Pica</u> -- we cited

21

1  <u>McGarry</u>, the <u>Tanen v. Southwest Airlines</u> case, which was the

2  gift certificate case.

3        The upshot is that ADA preemption applies to

4  claims that would regulate an airline's marketing or

5  advertising of its services, and we think the Court's more

6  rigorous standard that's reflected in the tentative, and the

7  reframing of the case to be about regulation of carbon

8  neutrality, ignores the nature of Plaintiff's claims, and

9  would subvert the congressional intent to deregulate the

10  airline industry and leave the design and content of airline

11  advertising to the airlines, subject to oversight by the

12  DOT.

13        I want to turn to the Plaintiff's claims here, and

14  I do think that there is -- there's real tension between ADA

15  preemption and the claims that the Plaintiff has asserted,

16  and I think that the tentative order doesn't fully grapple

17  with the import of the conclusion that Plaintiff's claims

18  have no bearing on Delta's rates or services.

19        In attempting to disentangle her claims from

20  Delta's rates and services, Plaintiff argues in her

21  opposition brief that Delta's alleged misrepresentations had

22  absolutely no bearing on the flight that she purchased or

23  the price she paid to travel with Delta, and that's at her

24  opposition at pages 10 and 13, where she argues that her

25  claims are, quote, "in no way tied to the price of the

22

1 individual flight."

2   The Court appears to accept that proposition in

3 concluding that Plaintiff's claims do not implicate

4 Plaintiff's -- Delta's rates, but, if the Court were to

5 accept this proposition, then Plaintiff has no economic

6 injury to support her statutory claims.  In other words,

7 Plaintiff is in a double bind.

8   She cannot both avoid preemption under the ADA and

9 allege the economic injury required to state a claim,

10 because the only possible economic injury she could have

11 suffered based on the conduct she alleges would necessarily

12 directly relate to the rate that she paid or the service she

13 received as a result of Delta's advertisements regarding its

14 carbon neutral status.

15   THE COURT:  Sorry.  Can you point the Court --

16 what was the page reference on the opposition that you were

17 reading from?

18   MR. BALSER:  Yes.  It's page 10 and 13, is what my

19 notes say, and I can find the exact --

20   THE COURT:  Yes, that would be great.  Thank you.

21   MR. BALSER:  Yes.  I must have the pages wrongly

22 here, your Honor, but I'll find it for you.  It's a --

23 there's a quote that said they're no way tied to the price

24 of an individual flight.

25   THE COURT:  Okay.

23

1          MR. BALSER:  That's the quote.  I'll find it when
2   I sit down.

3          THE COURT:  Okay.  Thank you.

4          MR. BALSER:  When I get back up, I'll cite the
5   Court to it.

6          THE COURT:  Okay.

7          MR. BALSER:  So, just to reorient where I'm going
8   here, so, in her first amended complaint, the Plaintiff
9   alleges that she would have paid less had she known, which
10  we say is really a price premium claim in disguise.  In her
11  opposition brief, she runs from that, and says that the
12  alleged misrepresentations didn't bear on the flight that
13  she purchased or the price that she paid.

14          So she's got this problem where she can't avoid
15  preemption under the ADA and say she's got the injury
16  required to state a claim, because the only injury she could
17  have has to be related to the service that she purchased,
18  which is a flight on Delta that she thought was carbon
19  neutral, that she claims it wasn't.

20          As the Court well knows, under false advertising
21  law, UCL, CLRA, Plaintiff must plead an economic injury to
22  survive dismissal, and her new tactic in her opposition is
23  to tack away from the allegations in the first amended
24  complaint and argue that she felt deceived, as a loyal Delta
25  customer, and personally cared about Delta's climate impact,

24

1  but that's not enough to plead economic injury, and the

2  Kwikset (phonetic) case that the Court relies on doesn't

3  stand for that proposition.

4         In Kwikset, the Court recognized that economic

5  injury is a -- in a misrepresentation case is overpaying for

6  the misrepresented good or service.  So any economic injury

7  that Plaintiff could allege related to her flight purchase

8  based on Delta's carbon neutral representations would run

9  headlong into preemption under the ADA.

10        She was either injured because she overpaid for

11 the flight, which directly impacts rates, or she doesn't

12 have an injury, it was just, you know, her feelings were

13 hurt, or she cared more about Delta, or she wished Delta was

14 better, which may avoid ADA preemption, but it doesn't state

15 a claim for injury sufficient to support her claims.

16        So, in short, her attempt to avoid preemption by

17 disassociating her claims from the price she paid and the

18 flight she traveled is a catch-22.  The claims are preempted

19 by the ADA because they relate to the price she paid for

20 Delta's service, or they have to be dismissed because

21 there's no economic injury.

22        Before closing, I would like to just touch on the

23 Court's analysis under the CLRA claim, CLRA count.  We think

24 that the tentative order errs in denying Delta's request to

25 dismiss Plaintiff's CLRA claims under Subsections A2 and A3.

25

1 Plaintiff does not allege that Delta represented the
2 services as having the approval of another entity, or that
3 Delta falsely signified that it had a particular endorsement
4 or sponsorship, which is what those two subparagraphs
5 require.  Delta makes no statement about the verification or
6 certification of its offsets.

7          The only statement that is at issue here is that
8 Delta is carbon neutral, and that doesn't fall under either
9 Subsection A2 or A3.  Notably, both Subsections A2 and A3
10 require pleading with particularity under Rule 9(b), and
11 Plaintiff has not alleged any statement at all about source
12 or certification, much less with the particularity required
13 by 9(b).  Nowhere has Delta said that "XYZ certifies that
14 Delta is carbon neutral," or that "We are sponsored by the
15 Carbon Neutral Society."  I mean, there's just nothing that
16 Delta says that would bring us within A2 and A3.

17          So, for those reasons, we think, your Honor, that
18 the A2 and A3 claims should be dismissed.  So, for all those
19 reasons, we think the Court should dismiss Plaintiff's
20 claims as either preempted under the ADA or for failure to
21 state a claim.

22          THE COURT:  Thank you.

23          MR. BALSER:  Thank you.

24          THE COURT:  And let me hear from Plaintiff's
25 counsel.

26

1          MR. HADERLEIN:  Thank you, your Honor, and thank
2  you again for the tentative.  I'd like to begin with the
3  price question.  That's obviously a key question in this
4  case, and I think it really neatly dovetails with the "All
5  advertising has to be preempted" contention by Delta,
6  because they're deeply related.
7          So, if we think about the argument that they're --
8  the real nature of their argument is that, by definition,
9  all of Delta's advertising, assuming it works, stimulates
10 demand, and what's demand?  It's consumers buying Delta
11 flights.  So that generates purchases of Delta flights, and
12 we know those purchases are at a price.
13         So that means that if the states are to regular
14 advertising and say, you know, the advertising is false, or
15 it's in some way against public policy, those laws are
16 operating, actually, with a clear connection to price,
17 because the relate to Delta's market share, which price is
18 obviously related to, because every transaction is at a
19 price.
20         THE COURT:  Well, I mean, to be fair, I don't
21 think that's what he's arguing.  He's arguing that the
22 complaint itself says she wouldn't have paid this price, so
23 this is about price.
24         MR. HADERLEIN:  Well, but, your Honor, it's
25 actually not true that it's about she wouldn't have paid

27

1   this price.  She wouldn't have paid the prices that she paid

2   for the flights, which is a wide variety of prices.  I mean,

3   flights have a wide price distribution, and pricing the

4   flights is actually very dynamic.  So it can't just be true

5   that, merely because someone buys a flight, based on a

6   representation, that the claim is that the prices themselves

7   are too high.  Under Kwikset, the analysis --

8           THE COURT:  And I'm sorry.  I'm just going to push

9   on that a little bit.  I think what defense counsel is

10  arguing is that the complaint says -- leaving aside what one

11  could argue, the complaint says that she would not have paid

12  this price for this flight because of these representations,

13  and that is why it's related to price and rates.

14          MR. HADERLEIN:  I understand.  I understand, your

15  Honor.

16          THE COURT:  And so, if that's not found in the

17  complaint, that you could point the Court to that, and/or

18  just respond to that argument.

19          MR. HADERLEIN:  I'll just respond to that

20  argument, then.

21          THE COURT:  Okay.  Thank you.

22          MR. HADERLEIN:  So it is obviously true that our

23  Plaintiff thinks that she would not have paid these prices

24  for these flights, and we're not going to walk away from

25  that.  I think that would be deeply silly.  The point is

28

1 that, under <u>Kwikset</u> and under related cases, like the <u>Coles</u>
2 <u>Skinner U.S.</u> (phonetic) case from 2013 in the Ninth Circuit,
3 but I think <u>Cole</u> --
4          MR. HADERLEIN:   <u>Skinner U.S. v. Coles</u>.
5          THE COURT:  Okay.  Thank you.
6          MR. HADERLEIN:  It's a 2013 Ninth Circuit case.  I
7 think the analysis under <u>Kwikset</u> is that when you have a
8 misrepresentation that is material to some consumers, and
9 material enough, but the consumers who it effectively misled
10 into purchasing the product might not have purchased the
11 product whatsoever, that that delta between what they paid
12 and what they would have liked to have paid is, first of
13 all, probably a little bit unknown, per consumer, but the
14 relevant question is whether or not the demand would have
15 happened at all, as in whether or not the purchase would
16 have occurred, and that's sufficient to confer standing, and
17 it's consistent, I think, with finding economic damages for
18 those people without arguing that Delta overcharged for its
19 flights.
20          I mean, arguably, Delta's pricing wouldn't have
21 changed if every single one of the consumers in the
22 eventually class, if this got certified, never bought a
23 Delta flight.  There might have been other economic forces
24 that meant those were the natural prices for those flights,
25 but that doesn't mean those consumers weren't harmed,

29

1 because they bought a Delta flight as opposed to, let's say,

2 a Southwest flight that has free bags, or a Spirit flight,

3 which is much cheaper, or, you know, a United flight, which

4 has, you know, a better royalty program, let's say.

5          All of those decisions go into the marketplace

6 moment when you buy a flight, and that's why material

7 misrepresentations confer standing regardless of there being

8 a consistent price premium, and I think, especially in the

9 context of airline flights, it's actually really difficult

10 to determine what those price premiums even would be, and

11 this is even true in the Second Circuit case that the other

12 side cites, which is the Abdu-Brisson case from the '80s,

13 and that was even before Internet dynamic pricing of

14 flights.

15          So I think that it would be a very difficult

16 position, actually, for the Court to ultimately rule that,

17 merely because there's economic harm to consumers for a

18 misrepresentation, that means that preemption has to occur,

19 just on the economics, but I also think that this is exactly

20 why I think the Court should make sure to hold on to the

21 Dilts test.  I think this is why the Dilts test is

22 appropriate, because the question of just any connection is

23 obviously too broad, because most things that happen in the

24 marketplace are going to have connections to price, inasmuch

25 as they benefit a corporation.

30

1          So that's the reason why, despite attempts
2  otherwise, I think their argument ultimately is that all
3  advertising has to be exempt from state regulation under
4  deregulation, because their point is that anything that
5  genuinely would benefit market share is going to have a
6  price attached, because what is market share?  It's people
7  buying flights at a certain price, based on a certain set of
8  beliefs about the airline in question and the flight that
9  they're buying.
10          So that's why I think the <u>Dilts</u> test is exactly
11  right, because the <u>Dilts</u> test has to -- it's not a
12  bright-line test, but it's an appropriate test, which is it
13  says, "Well, the purpose of deregulation is to make sure
14  that the airlines can," as they said, "provide efficiency,
15  provide innovation," but that should happen on the flights.
16  That should happen in the way the planes are designed, in
17  where they run, in which stops they have, and how they price
18  themselves to better provide airline travel for individuals.
19          So that means, then, that the <u>Dilts</u> test is the
20  proper corollary for how to protect those interests, because
21  the <u>Dilts</u> test says, "Don't take away the autonomy of the
22  airlines to be an efficient money-making machine."  That's
23  the whole concept of deregulation.  That has nothing to do
24  with whether or not a brand has the right to lie about its
25  global investments in mitigating climate change.

31

1          And I'd note that there's a lot of equivocation

2   from the other side about how "Well, consumers just really

3   care about emissions on flights," but consumers really care

4   about emissions from all kinds of corporations.  Delta is

5   not the only company that called itself "carbon neutral" in

6   the last few years.  It's all kinds of cases.

7          I mean, we filed another one against the New

8   Hummers (phonetic) platform, right?  I mean, the fact is

9   that carbon emissions are in the supply chain of almost any

10  company that sells goods or transports anything in the

11  process of selling those goods, or, potentially, I mean,

12  there's carbon emissions in the operation of this

13  courthouse, you know, unless it's --

14         THE COURT:  What is -- I'm sorry.  What's the

15  relevance of that?  Because question is -- is not whether

16  there's something different here than elsewhere.  The

17  question is whether the carbon emissions issue is part of

18  the airline services.  The fact that it may also be the

19  parties -- everything else that everyone else does

20  doesn't --

21         MR. HADERLEIN:  I agree with that, your Honor.

22         THE COURT:  Okay.

23         MR. HADERLEIN:  Let me bring it home a little bit,

24  then.

25         THE COURT:  Thank you.

1      MR. HADERLEIN:  So the fact is that the carbon

2  neutrality is at the brand level, and at the corporate-wide

3  level.  It's not -- obviously, yes.  If this carbon

4  neutrality specifically was done because we now have only

5  electric planes run on solar power, that would be part of

6  the service, because they would have changed the planes in

7  question.  They would have changed the fueling, et cetera.

8  That's not what this case is about.

9      This case is about offsetting, and there's a

10  reason offsetting isn't mentioned in any of the briefs by

11  Delta, because the whole concept of offsetting is placement

12  of the client in question outside of the company's

13  operations, outside of their core services, arguably even

14  outside of their supply chain.  It's essentially a form of

15  corporate carbon accounting, that you buy things from other

16  vendors to ensure that you can tell other people you're

17  making a difference on climate change without changing your

18  core services.

19      And I would also note that when we talk about, you

20  know, the things like, you know, the napkin, right, and the

21  fact that carbon neutrality is being advertised directly to

22  consumers because they care about it, and it's being even

23  advertised at the point of sale, it's important to remember

24  that the carbon neutrality question is a brand-level

25  question, and when we talk about things like -- just because

33

1  the CLRA -- you need to have standing because you bought a

2  service or a product?  It doesn't mean that you can't sue

3  for brand-level misrepresentations.  That's part of false

4  advertising law.

5           The Coles case talks about this specifically, that

6  something doesn't have to be in the product itself for you

7  to be misled by what the company tells you about themselves

8  as a company.  I think that's really the genre of cases

9  we're in, and that's why there haven't been any analogous

10 cases in either direction in terms of whether or not they

11 should be preempted, because I don't think these kinds of

12 brand-level misrepresentations normally percolate in the

13 federal courts or in the state courts, because they're often

14 not provably false.

15          If you say you're an ethical company or a

16 sustainable company, without more, you're going to just get

17 dismissed on other grounds, but carbon neutrality is one of

18 those rare examples of an objective promise to consumers

19 about this kind of brand-level representation, and I think

20 that's why this case ultimately ends up being novel, but

21 it's also why we would stand by the tentative.

22          In terms of the CLRA issue, I would just note that

23 if you look at the section of the complaint where we talk

24 about Delta's representations, we also mention

25 representations from their SEC filings, from podcasts where

34

1  they actually go into detail about what offsetting is.  It's

2  not true that offsetting isn't part of the representations.

3  If you look at the myriad of representations, it's part of

4  the universe.

5       Now, obviously, the most, I think, well-seen

6  representations were advertisements that merely say, "Carbon

7  neutrality," but that universe of representations is

8  mentioned in the complaint.  It was seen by our Plaintiff,

9  and it was probably seen by a lot of other consumers.

10      And I would also just note that a lot of this case

11  really ends up boiling down to, is carbon neutrality even a

12  core service?  And a lot of their arguments defer to that,

13  and I would just -- I would again stand by, even if it's a

14  minority opinion, that I think that the Ninth Circuit has

15  cabined the definition of "services," and also that merely

16  because consumer protection laws confer standing and protect

17  consumers at the point of sale for buying products and

18  services does not necessarily mean that those laws are meant

19  to actually be regulating what those services and products

20  necessarily are, if the representation that's being

21  regulated is at the brand level.

22      Those are all the points I have.

23      THE COURT:  Okay.  Thank you.

24      Anything final from Delta's counsel?

25      MR. BALSER:  Yes, your Honor, very briefly.  I

35

1  wanted to direct the Court to the references that I made in

2  my argument that I couldn't find when I was standing at the

3  podium before, and just to reorient, this is the argument

4  that, in attempting to disentangle our claims from Delta's

5  rates and services, Plaintiff argues in her opposition brief

6  that the alleged misrepresentations had absolutely no

7  bearing on the flight she purchased or the price she paid to

8  travel with Delta, and the first citation is at page two,

9  line 12 of her opposition brief, where she says:

10              "Corporate-level misrepresentations as

11              to the climate impact of purchases of

12              carbon offsets are in no way tied to the

13              price of an individual flight."

14         And that's repeated at page 10.

15         THE COURT:  I'm sorry.  The line, again, on page

16  two?

17         MR. BALSER:  Page two, line 12, and at page 10,

18  lines three through five, where she says:

19              "The reality is that corporate-level

20              misrepresentations as to the climate

21              impact of purchases of carbon offsets

22              are in no way tied to the price of an

23              individual flight."

24         THE COURT:  And I guess what I heard you say was

25  something more like she said what she paid was in no way

36

1  related, or what she should have paid.  I thought I heard

2  you say something along those lines.

3            MR. BALSER:  Right.

4            THE COURT:  I don't think they dispute that this

5  is their point, that the pricing generally -- I think that

6  their point is that the carbon neutrality, because it

7  doesn't actually -- there's nothing that Delta does

8  differently in its actual flights, so it can't take that

9  into account in the pricing.  I guess that's what I thought

10 they were saying, not disclaiming the idea that she would

11 have paid something less if she had been told the truth, or

12 that she would have gone to somebody else if she had been

13 told the truth.

14           MR. BALSER:  Right.  I think they're trying to

15 walk a tightrope.  I think they recognize the tension

16 between the preemption problem and the need to state

17 sufficient injury to establish the claims, and I think

18 they're trying to walk a fine line.

19           THE COURT:  Yes.  The question is, have they done

20 so?  But I just -- I heard you say something other than what

21 I see in the argument, but now we're clear on what it is

22 you're pointing to, so I will consider that.

23           MR. BALSER:  Thank you.  So the -- two other --

24 three other quick points.  Back to the question the Court

25 asked about "Are carbon emissions part of the airline's core

37

services?," and the questions we went back and forth on, on
prostitution and gambling.  You know, another point to make
here is that, unlike prostitution and gambling, the
emissions can't be separated from our core services, and
representing how to deal with something that's inherent in
flight is different from the prostitution and gambling
analogies, in our view.  So this is something that just --
it happens on every flight.  It's connected to the service.

On the CLRA claims, just briefly, there is no -- I
didn't hear anything.  I mean, podcast or securities
filings, there is no pointing to any source or certification
which are required for those two subparagraphs.  That's the
key.  The fact that we say in many places that we're carbon
neutral doesn't establish source or certification, which is
required for the claims that they're asserting under A2 and
A3.

Finally, your Honor, I hope that I have convinced
the Court that these claims should be preempted, but, if I
haven't, and the Court issues an order, we would
respectfully request that the Court consider including a
certification under 12:9(2)(b) in the order for possible
consideration by the Court of Appeals in the event that the
Court rules that these advertising claims are not preempted,
because it would be a novel issue.  It would be a first-time
decision on an advertising claim, and there would be a lot

38

1  of money spent in discovery in this case, experts, fact

2  discovery, class certification, summary judgment, and at the

3  end of the day, if the Ninth Circuit agrees with us that the

4  claims should be preempted, we could avoid all of that, if

5  they would -- if the Court would certify, and if the Ninth

6  Circuit would take a look at it on an interlocutory basis.

7            THE COURT:  Let me ask you this, and I don't

8  recall seeing that in your briefing.  Was it in your

9  briefing?

10           MR. BALSER:  It was not.

11           THE COURT:  Okay.  And so, as you can imagine, I'm

12  disinclined to -- because what you've just said, everyone

13  could say.  So I'm not inclined to take that approach, but,

14  if there's something I'm missing about why this is so

15  different -- the Court deals with novel issues every day,

16  and the fact that it's novel doesn't mean that interlocutory

17  review is permitted, or that I should certify it.

18           So, you know, obviously, you have -- if and when

19  the Court issues its ruling, you have the ability to file

20  whatever motions you want to file, but, unless I'm missing

21  something major about why this is so different that the

22  Court should grant that type of relief without any briefing,

23  I don't know if you have anything on that.

24           MR. BALSER:  Yes.  I mean, the only thing I would

25  say is the points we have made in our brief, that there are

39

1  no false advertising cases that we're aware of in, you know,

2  North American jurisprudence that finds a claim not to be

3  preempted.  This would break new ground, and we think

4  there's a reason for that.  And so I do think that it would

5  be an issue that would be outcome-determinative,

6  dispositive, that would warrant interlocutory review.

7          THE COURT:  Understood.  Okay.  Thank you.

8          I don't think I need to hear from Plaintiffs on

9  that point.  I think I've been transparent about my

10 skepticism of that approach, but, of course, you know, if we

11 get to that point, defense counsel can file whatever motions

12 they wish, and the Court will consider that fully.  I

13 just -- I did want to be transparent while we're here, so

14 that you don't have a false impression of what the Court is

15 thinking about on that point.

16         Okay.  With that, I do want to thank the parties

17 for their briefing and the argument.  It's very interesting

18 issues, and well handled by the parties, and the Court will

19 take the matter under submission.  Happy holidays to

20 everyone.

21         MR. HADERLEIN:  Happy holidays, your Honor.

22         ALL:  Thank you, your Honor.

23         THE CLERK:  All rise.  This court is in recess.

24     (Proceedings concluded.)

25

40

1          I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   /s/Lorraine Caldwell                1/9/2024
    Transcriber                         Date
6
    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8

9   /s/L.L. Francisco
    L.L. Francisco, President
10  Echo Reporting, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25